**BATA SHOE CO., INC.**

v.

**The UNITED STATES.**

No. 646–71.

United States Court of Claims.

Feb. 21, 1979.

Walter A. I. Wilson, Washington, D. C., for plaintiff; John T. Koehler, attorney of record. Hudson, Creyke, Koehler, Tacke & Bixler, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before DAVIS, KASHIWA and BENNETT, Judges.

## OPINION

DAVIS, Judge:

The Renegotiation Board determined that Bata Shoe Company ("Bata" or "Bata Shoe") had realized excessive profits of $800,000 for the year 1967. Plaintiff sought a *de novo* review of that determination in this court pursuant to the Renegotiation Act of 1951, 50 U.S.C. App. §§ 1211–1233 (1970) *as amended* (Supp.V, 1975). Trial Judge Bernhardt reviewed each of the statutory factors in 50 U.S.C. App. § 1213(e) (1970) and found that plaintiff was entitled to favorable consideration under each factor. He then concluded that plaintiff was not guilty of "profiteering" and was therefore entitled to a clearance. Defendant seeks an excess profits determination of $1,000,000. Although we agree that the plaintiff does merit some favorable consideration under each of the statutory factors, we find that here the amount of favorable consideration is not sufficient to justify a clearance. *Cf. Dynasciences Corp. v. United States,* 214 Ct.Cl. 643 (1977) (favorable consideration of all statutory factors; excessive profits found); *Tool Products Co. v. United States,* 589 F.2d 506 (Ct.Cl.1978) (favorable consideration on all factors except net worth which was "neutral"; excessive profits found). On the other hand, a finding of $1,000,000 in excess profits would be, on this record, excessive in itself. We determine that Bata Shoe realized excessive profits of $330,000 in 1967.[1]

### I.

Bata, a shoe manufacturer, was incorporated in 1939. It consisted originally of a single plant in Belcamp, Maryland. A second plant was added at Salem, Indiana, in 1963. Bata's normal commercial business consists primarily of the manufacture of canvas shoes with rubber and vinyl soles (such as deck shoes, sneakers, and other athletic shoes), and also waterproof footwear. Until its decision in 1966 to abandon production of civilian leather goods, plaintiff also manufactured civilian leather footwear at its Belcamp plant. It had a reputation for quality leather footwear, and supplied major retail outlets such as Sears Roebuck and Company, Montgomery Ward, and J. C. Penney Company. Through the years its leather footwear styles remained essentially unchanged, primarily utilitarian work and street shoes and boots.

During 1967 plaintiff's renegotiable business comprised the manufacture under five prime defense contracts of tropical combat boots with canvas and leather uppers and vulcanized rubber soles and heels plus one small defense contract for waterproof buckle overshoes. No subcontracts were awarded. (The renegotiable work was done at the Belcamp plant.) Under the five combat boot contracts Bata delivered some 1,195,464 pairs of boots for total renegotiable sales (after minor adjustments) of $15,199,924. Plaintiff's renegotiable sales in 1967 comprised 31.8 of its total sales.

Procedures used to procure tropical combat boots in the mid-1960's were unusual because the war in Vietnam had created a high demand for the product at the same time that the industry's capacity to produce was relatively low. Solicitations leading to the award of plaintiff's first three contracts were issued stating a delivery date. Contractors were encouraged to commit themselves to provide as many pairs of boots as they were capable of manufacturing and to state a price. Bidders were permitted to

---

1. We adopt, with minor modifications, the trial judge's findings of fact which are not printed together with this opinion. We have also borrowed parts of the trial judge's opinion. See our order of this date for the text of the modifications.

specify a delivery schedule other than the one noted in the solicitation. After the bids were opened and the delivery dates established, procurement officials computed a period of time as of which the government would be able to obtain the entire quantity desired. The bidders whose offers made up this quantity would then be asked to state their best delivery schedule and price. Bidders to whom awards were not made were rejected because of price rather than delivery date. Several awards were made as to each solicitation. In these negotiated bid-type contracts the government accepted almost every offer. Later, when demand slackened, government footwear needs were met by using formal advertising procedures. The last two of plaintiff's tropical combat boot contracts which contributed to 1967 renegotiable profits resulted from such formal advertising.

In the manufacture of footwear, plaintiff and a few of its competitors used a "direct vulcanization process," which permitted attachment of the sole of the shoe directly to the leather or canvas upper part of the shoe without stitching, through the use of a press which applied temperature, cement, and pressure to achieve the required degree of adhesion. When the government first became interested in the vulcanization process several kinds of vulcanizing presses were being used in the industry. Plaintiff alone used the Union press, although that press was available to its competitors. The Union press cost considerably more than others, but had substantial production advantages over other presses. The Union press was more fully automated than other vulcanizing machines, and exerted greater hydraulic pressure in vulcanizing shoes.

Prior to 1960 government footwear employed the "Goodyear Welt" method of stitching the sole to the upper part of the boot. Stitching deteriorated in hot, humid climates. It was deemed necessary to develop an alternative to the Goodyear Welt method of producing combat boots. After considerable experimentation, the Army adopted the vulcanized sole combat boot, which withstood jungle conditions better than Goodyear Welt boots. As we have said, Bata Shoe produced its tropical combat boots by the Union press vulcanization process.

## II.

We must first establish what plaintiff's profits on its renegotiable business were in 1967. The parties agree on a base figure of $2,533,560, subject to certain caveats. Plaintiff would reduce this figure by reallocating part of a 1966 loss in its commercial business to 1967. Defendant would increase this base figure by reallocating part of a 1967 loss plaintiff incurred in 1966. The trial judge rejected both proposed alterations as inconsistent with Bata Shoe's normal accounting procedures and we agree. Accordingly, plaintiff's renegotiable profits for 1967 are $2,533,560, or 16.7 percent of total renegotiable sales of $15,199,924.

One acceptable way of determining excessive profits is finding a range of "normal" profits as the "starting point." The court must then evaluate the statutory factors to determine whether plaintiff is entitled to any upward adjustment in allowable profits. *See, e. g., Butkin Precision Mfg. Corp. v. United States,* 544 F.2d 499, 505–06, 211 Ct.Cl. 110, 121–22 (1976); *Blue Bell Inc. v. United States,* 556 F.2d 1118, 1125–26, 213 Ct.Cl. 442, 452–53 (1977); *Camel Mfg. Co. v. United States,* 572 F.2d 280, 308–09, 215 Ct.Cl. 460, 510–513 (1978); *Tool Products Co. v. United States,* 589 F.2d 506, at 508 (Ct.Cl.1978).[2] In this instance, we have arrived at a "starting point" of 10–11 percent return on renegotiable sales, or ap-

---

**2.** We do not suggest that the "starting point" plus adjustment for statutory factors is the only valid method for analyzing renegotiation cases. Indeed, this court has decided many renegotiation cases without alluding to any starting point. *E. g., Mason & Hanger-Silas Mason Co. v. United States,* 518 F.2d 1341, 207 Ct.Cl. 106 (1975); *Major Coat Co. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1 (1976); *Manufacturers Service Co. v. United States,* 582 F.2d 561, 217 Ct.Cl. —— (1978). Rather, we find that in this case the "starting point" approach is a convenient and appropriate method.

proximately $1,520,000–$1,670,000. This 10–11% starting point is reached by use of comparative data, the figures for Bata's previous sales year, and a "sideways glance" at the Renegotiation Board's final figure. The comparative data for firms most similar to Bata Shoe, other tropical combat boot manufacturers, reveals a range of returns on renegotiable sales of .6%–16.9% for 1967. Ignoring the two extreme figures, one finds a rate of return clustered about the 11 percent mark.[3] Including both the high and low firms, the average return on renegotiable sales is 9.5 percent.

We do not rely alone on these figures, which are unaudited and may be inflated by wartime distortions of the competitive markets. *See, e. g., Camel Mfg. Corp. v. United States,* 572 F.2d 280, 300, 215 Ct.Cl. 460, 496 (1978). Bata's own profits for 1966, the only year in which it had a similar renegotiation business and made a profit,[4] show an 11.4 percent return on sales. Further, a "sideways glance" at the Renegotiation Board's final adjustment reveals that the Board would allow Bata a 12.7 percent return, implying that a return of 10–11 percent would probably not be considered abnormal by the Board. Although we disagree with the Board's adjustments for the statutory factors, we find some further confirmation of our 10–11 percent range for the "starting point" by the ultimate percentage adopted by the Board. *See Gibraltar Mfg. Co. v. United States,* 546 F.2d 386, 388, 212 Ct.Cl. 226, 230 (1976) (court can make "sideways glance" at Board decision); *Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1179 n. 21, 215 Ct.Cl. 536, 569 (1978) (us-

ing percentage return allowed by Board after renegotiation of similar firms as "suggestive" data); *Camel Mfg. Co. v. United States,* 572 F.2d 280, 300, 215 Ct.Cl. 460, 496 (1978) (same).

Finally we note that although defendant's expert selected a "starting point" of 4.97 percent, based on various industry averages for commercial shoe manufacturers, he concluded by advocating that Bata be left with a 9.9 percent return. We do not adopt the expert's method for the reasons explained in Part IV, *infra,* but it is noteworthy that defendant would concede that a return of approximately 10 percent would be reasonable for this contractor. We acknowledge that a different "starting point" might be justified if we had been given more data on other comparable shoe firms, but in the absence of such evidence the court is left to grasp for a reasonable approximation. *See e. g., Manufacturers Service Co. v. United States,* 582 F.2d 561, 577, 217 Ct.Cl. —— (1978) (without meaningful comparisons, determination of excess profits must be broad brush); *Camel Mfg. Co. v. United States,* 572 F.2d 280, 310, 215 Ct.Cl. 460, 512 (1978) (broad brush approach applied to give plaintiff benefit of statutory factors); *Major Coat Co. v. United States,* 543 F.2d 97, 124, 211 Ct.Cl. 1, 48 (1976).

In Part III, *infra,* we consider whether plaintiff is entitled to credit, beyond the "starting point," under the various statutory factors. To foreshadow our conclusion, we believe that Bata merits favorable consideration under each of the fac-

---

3. The figures for 1967, which are based on unaudited forms submitted to the Renegotiation Board by the contractors, are as follows:

| Company | % Return of profits to renegotiable sales |
|---|---|
| Endicott-Johnson | .6 |
| Interco | 11.8 |
| Genesco | 5.0 |
| Hi-Pals | 16.9 |
| Wellco | 11.1 * |
| Safety First | 11.7 ** |

\* This is the figure after renegotiation. Before renegotiation, Wellco had a 16.9 percent return.

\*\* This figure excludes a loss carried forward from Safety First's 1966 fiscal year.

4. Bata started manufacturing tropical combat boots in 1965, in which it suffered a loss of $171,000. Bata also suffered losses in two subsequent years of renegotiable combat boot business, losing $219,000 and $569,000 in 1968 and 1969 respectively. Its average rate of return on commercial sales at its Salem plant for 1965–68 was 9.55 percent. While this isolated return on commercial sales supports our selection of a 10–11 percent profit range, we note that Bata's return on all commercial operations for 1965–69 was 4.99 percent, a figure considerably lower than our "starting point."

**14**

tors, but that on this record such credit is moderate for the most part, rather than plenary. We have two overall reservations about the strength of the credit under the statutory factors. First, although the renegotiation process inherently involves comparisons to determine how reasonable a plaintiff's profits are as compared with other similarly situated firms, the comparative data here is very thin.[5] Second, any absolute credit Bata Shoe deserves must be tempered by the fact that it made its 1967 profits in a less than fully competitive market. While the presence or absence of a competitive market does not per se render a contractor's profits reasonable or unreasonable, the absence of such a market serves as an important context in which to evaluate both its profits and the statutory credits. *Compare Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1166–67, 215 Ct.Cl. 536, 544–547 (1978) (overemphasis on market structure contrary to renegotiation) *with id.* 571 F.2d at 1179 (evidence of wartime market imperfections part of reason for finding profits unreasonable); *Manufacturers Service Co. v. United States,* 582 F.2d 561, 573–75, 217 Ct.Cl. —— (1978) (evidence of market dis-

torted by wartime demands supports initial belief that plaintiff's profits were excessive).

## III.

■ A. *Efficiency:* The renegotiation statute lists efficiency as the first factor to be considered,[6] and gives several subcategories of efficiency which we now explore *seriatim:* quantity of production; quality of production; reduction of costs; and economy in the use of materials, facilities, and manpower. 50 U.S.C. App. § 1213(e) (1970).

### 1. *Quantity of production*

Bata was the largest supplier of tropical combat boots during the Vietnam era. All contract deliveries were on or ahead of schedule. In 1967 it delivered 61 percent more boots than required by delivery schedules. Its 6,000 pairs per week rate of production in early 1966 increased to 21,000 by the end of 1966, and averaged more than 28,000 weekly in 1967. It accomplished this not by plant expansion, but by maximizing

**5.** We reiterate that defendant may well escape a judgment of clearance for lack of proof only because this case was tried before our decision in *Major Coat* in October 1976. *See, e. g., Manufacturer's Service Co. v. United States,* 582 F.2d 561, 577 n. 28, 217 Ct.Cl. —— (1978); *Tool Products Co. v. United States,* 589 F.2d 506, at 507 (Ct.Cl.1978).

**6.** Although efficiency is the primary factor in the statutory scheme, *Tool Products Co. v. United States,* 589 F.2d 506, at 508 (Ct.Cl.1978), the statute provides that all factors should be considered and no one factor is decisive. *See* 50 U.S.C. § 1213(e) (1970); *Mason & Hanger-Silas Mason Co. v. United States,* 518 F.2d 1341, 1348, 207 Ct.Cl. 106, 118 (1975).

The statutory factors are stated in section 1213(e) of 50 U.S.C. App. as follows: "In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of produc-

tion, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted."

In addition, the Renegotiation Board has promulgated its interpretation of these factors at 32 C.F.R. part 1460 (1978). In using such regulations as helpful guidelines, we need not decide their precise weight in a *de novo* proceeding. *See Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1171 n. 8, 215 Ct.Cl. 536, 554 (1978).

the use of manpower and equipment. An efficiency report by the government states that it utilized existing facilities effectively and had no need to expand. Almost all workers in civilian leather at plaintiff's Belcamp factory were transferred to boot production, and extensive personnel training courses were instituted. The plant was placed on a 7-day, 24 hours per day, 3-shift basis of operation. Plaintiff utilized the original thirteen Union presses at its Belcamp plant on a full-time basis and during 1966–67 transferred additional Union press equipment to Belcamp. This equipment transfer disrupted civilian shoe production at Bata's Salem plant.

■ Although we found in *Mills Manufacturing* that mere increase in the number of shifts was not there sufficient to merit significant credit for efficiency, we conclude here that, in the absence of contradictory data, plaintiff is entitled to some credit for its quantity of production. *Compare Major Coat Co. v. United States,* 543 F.2d 97, 117, 211 Ct.Cl. 1, 36 (1976) (court presumed that contractor among the most efficient producers) *with Mills Manufacturing Corp. v. United States,* 571 F.2d 1162, 1175, 215 Ct.Cl. 536, 562 (1978).

### 2. *Quality of production*

■ Plaintiff's record of rejects decreased from 7 percent in the first 5 months of 1966 to 3.3 percent in the last 7 months of that year, and to .5 percent throughout 1967, as compared to Bata's civilian rejection rate then and now of about 5 percent. The Defense Supply Agency's Performance Reports to the Renegotiation Board pronounced plaintiff's Quality Performance Rating for 1967 as "Highly Satisfactory". There is no evidence in the record that its competitors performing boot contracts for the government earned similar ratings in 1967, although that may be simply an omission in the evidence presented. The Regulations list "maintenance of standards of quality" and rejection records as evidence

of efficiency justifying higher profits. 32 C.F.R. § 1460.9(b)(2) (1978); *see A. C. Ball Co. v. United States,* 531 F.2d 993, 1000, 209 Ct.Cl. 223, 236 (1976). Plaintiff qualifies for favorable recognition under this criterion.

### 3. *Reduction of costs*

■ The record provides very meager data on plaintiff's reduction of costs, at least in comparison with other manufacturers. *See* 32 C.F.R. § 1460.9(b)(3) (1978) (contractor entitled to favorable consideration for reduction costs relative to similar manufacturers' costs). We have no data illustrating Bata's administrative and selling costs or a gradual reduction of those costs. *See Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1175, 215 Ct.Cl. 536, 562 (1978) (comparing plaintiff's costs with other military contractors). Nevertheless, the trial judge found and we agree, that plaintiff did reduce its costs by lowering its rejection rate and by efficiently utilizing its equipment and manpower. We find therefore that plaintiff is entitled to some favorable consideration for reduced costs, but are uncertain as to the degree of credit. *Cf. Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1176, 215 Ct.Cl. 536, 563 (1978) (plaintiff entitled to some favorable consideration for efficiency, but not sufficient consideration to grant clearance).

### 4. *Economy in use of materials, facilities and manpower*

■ Plaintiff was efficient in the use of its manpower and facilities. A government efficiency report recognized its efficiency in developing a method of cutting government-furnished materials which minimized waste, and its effective utilization of facilities. Although we are again troubled by the lack of any comparative data on Bata's economies relative to other firms, we find the evidence, absent Government rebuttal, sufficient to justify some favorable consideration for plaintiff. *Aero Spacelines, Inc.*

*v. United States,* 530 F.2d 324, 350, 208 Ct.Cl. 704, 747 (1976); *see* 32 C.F.R. § 1460.-9(b)(4) (1978).

### 5. *Summary on efficiency*

In concluding that plaintiff's quantity and quality of production, reduction of costs and economies in materials justify an over-all favorable credit for efficiency, we recall prior statements that such efficiency can only be correctly evaluated in comparison with other firms. *See Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1174, 215 Ct.Cl. 536, 558 (1978); *Major Coat Co. v. United States,* 543 F.2d 97, 116–17, 211 Ct.Cl. 1, 34–35 (1976). Here, we have evidence only that Bata Shoe produced a very high quantity of combat boots, with low rejection rates, some control of fixed costs and some economy in using government materials. The Government must bear the burden of failing to rebut plaintiff's prima facie case. *Lykes Bros. S. S. Co. v. United States,* 459 F.2d 1393, 198 Ct.Cl. 312 (1972) (*en banc*); *see e. g., Major Coat Co. v. United States,* 543 F.2d 97, 117, 123, 211 Ct.Cl. 1, 36, 47 (1976); *Manufacturers Service Co. v. United States,* 582 F.2d 561, 570, 217 Ct.Cl. —— (1978) (plaintiff satisfied prima facie case for efficiency by showing reduction in costs and prices; high quality production in great quantities). In at least one aspect relied upon to establish Bata's efficiency—favorable government efficiency reviews and quality performance reports—no evidence was introduced to show that other combat boot manufacturers received similar reports and commendations.[7] Thus, we conclude, as in *Manufacturers Service Co.,* that plaintiff is entitled to a substantial degree of favorable recognition for efficiency, "at least in the absence of comparative information." *Manufacturers Service Co. v. United States,* 582 F.2d 561, 576, 217 Ct.Cl. —— (1978); *cf. Camel Mfg. Co. v. United States,* 572 F.2d 280, 303, 215 Ct.Cl. 460, 501 (1978) (although court cannot quantify amount plaintiff entitled to under efficiency, it cannot ignore congressional mandate to consider efficiency).

### B. *Reasonableness of costs and profits*

■ The Board's regulations and decisions of this court indicate that a comparison of costs and profits should be made, if possible, on two bases—the contractor's own costs and profits in prior years and the costs and profits of other similar contractors in the review year. 32 C.F.R. § 1460.-10(b)(1) (1978) *quoted in Mason & Hanger-Silas Mason Co. v. United States,* 518 F.2d 1341, 1360, 207 Ct.Cl. 106, 138 (1975); *see, e. g., Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1171, 1179, 215 Ct.Cl. 536, 553, 569 (1978) (use of both "historic norm" and profits of other renegotiated manufacturers); *Camel Mfg. Co. v. United States,* 572 F.2d 280, 299–302, 215 Ct.Cl. 460, 494–500 (1978) (using comparisons of both other competitors and contractor's own "base years"). Unfortunately, we again find that useful comparative data is lacking, particularly as to the reasonableness of Bata's costs. Its average unit prices declined from a high of $14.55 per unit in 1966 to a low of $9.41 in 1967, but this does not provide any sure basis for evaluating its costs, particularly its fixed costs. Similarly the record does not disclose any data comparing Bata's costs with other manufacturers. Even if such data were presented, its usefulness might be limited because Bata had a substantially greater capital investment (in its Union presses) than other combat boot manufacturers. The trial judge found that plaintiff's costs were lowered by its depreciation policy. The company depreciated its Union presses at a normal rate, despite the fact that it used the machines continuously. However, there are no facts indicating how much this

---

7. While the Government's economic expert, Dr. Glass, testified that he found no evidence that Bata Shoe's performance was sufficiently extraordinary to merit additional consideration, the basis for Dr. Glass' conclusion is uncertain. The trial judge did not accept Dr. Glass' testi-mony and the Government has not convinced us that the trial judge erred on this point. We note also that the Renegotiation Board found that plaintiff had performed in a "highly efficient" manner.

depreciation policy lowered Bata's costs.[8] The only remaining evidence is contained in government performance reports evaluating plaintiff's costs and prices as "reasonable." Although we accept such unchallenged evidence, its probative value, without comparative indices, is not strong.

The comparative data on plaintiff's profits, though slightly more ample, is also of somewhat limited utility. The base-years index reveals a mixed picture. During the 5-year period 1965–69, plaintiff lost a total of $959,000 on its renegotiable business in three of the years, and made a profit of about $3,371,560 in two of the years, for a net overall profit of about $2,412,560. In 1966, the only other year in which Bata Shoe made a profit, the profit was $838,000 or 11.4 percent of renegotiable business. On its nonrenegotiable business for 1965–1969, plaintiff had an average profit on sales of 4.99 percent, and its return on commercial sales from 1962–1967 ranged from 9.4–3.9 percent. Comparison of Bata's profits with other groups of shoe manufacturers also reveals a diverse picture:

| Source | Method of calculation | Years | Range of profits on net sales |
|---|---|---|---|
| Federal Trade Commission | Average profit rates for "leather and leather products" | 1963–1967 | 3.7–5.4% |
| Internal Revenue Service | Income returns for "non-rubber footwear" companies | 1963–1967 | 3.39–4.87% |
| Dun & Bradstreet | Median ratios for 112–119 "shoe manufacturing" firms | 1963–1967 | 1.71–2.62% |
| Renegotiation Board | Unaudited reports of returns by seven combat boot manufacturers | 1966–1968 | Losses–16.9% |

Data from the most readily comparable group, other combat boot manufacturers, indicate a range of profits of around 11 percent. *See* Part II, *supra,* n. 3. However, this figure is not highly reliable because it represents unaudited figures. In addition, with the exception of one firm whose 1967 profits were renegotiated from an initial 16.9 percent to 11.1 percent, these figures were not subject to renegotiation, and thus could be inflated by profits earned during a period distorted by wartime demands. *See Camel Mfg. Co. v. United States,* 572 F.2d 280, 300, 215 Ct.Cl. 460, 496 (1978). Other measurements of the reasonableness of Bata Shoe's profits, the return on capital and net worth, discussed *infra,* also confirm this general sketch—a wide diversity of ranges, but Bata's returns are at the top of the highest index (for combat boot manufacturers) and considerably higher than all other indices.

The statute requires consideration of the reasonableness of costs and profits "with particular regard to volume of production." 50 U.S.C. App. § 1213(e)(1) (1970). In explaining this factor the Board's regulations state that favorable consideration will be given to an increase in volume, but that when a company can increase volume without increasing its costs, part of the decreased unit price should normally go to the Government. 32 C.F.R. § 1460.10(b)(3) (1978). Here, Bata Shoe definitely increased its volume to become the single largest supplier of tropical combat boots under contract commitments in 1967. Its corresponding costs did not increase, and it gradually reduced its average per unit price from $14.55 (highest accepted bid) in June 1966, to $13.92 (highest accepted bid) in December 1966, to $9.41 (lowest accepted bid) in June 1967. These voluntary reduc-

8. The trial judge indicated that the amount of "additional depreciation expense" was between $18,800–$23,511. We accept the figures, but are uncertain how to apply them in order to assess the *comparative* reasonableness of Bata Shoe's costs. At most, such figures indicate the court's final determination of excessive profits, if any, ought to include an $18–23,000 credit to Bata, not what the final computation ought to be.

tions are mitigated in part by the fact that some 68 percent of Bata's 1967 deliveries were made under the two 1966 contracts in which its price was the highest accepted by the Government. Moreover, we reemphasize our comment in *Manufacturers Service Co.*, that without more data about the timing of the price decreases, particularly in comparison to the contractor's per unit cost reductions, such voluntary price reductions for greater volume are difficult to evaluate. 582 F.2d 561, 576–77, 217 Ct.Cl. —— (1978); *see Mason & Hanger-Silas Mason Co. v. United States*, 518 F.2d 1341, 1362–63, 207 Ct.Cl. 106, 141–43 (1975). We must conclude, however—given the lack of comparative data—that Bata Shoe's costs were reasonable. The ultimate conclusion on the reasonableness of Bata's profits is reserved for the final part of this opinion. *See* Part IV, *infra*. But we note that although the indices before the court reveal a diversity of profit ranges, Bata's 16.7 percent return exceeds any other rate of return (except for one other combat boot manufacturer who achieved a 16.9 percent return—a profit not renegotiated by the Board).

## C. *Capital employed*

 Section 103(e) of the Act provides that in determining excessive profits there shall be taken into consideration the contractor's "net worth, with particular regard to the amount and source of public and private capital employed." 50 U.S.C. App. § 1213(e) (1970). The Board's regulation expands on this statutory factor, principally by defining the terms "net worth" and "capital employed", stating that the relationship of profit to net worth and capital employed is to be "one of the considerations in the final determination of what constitutes excessive profits." 32 C.F.R. § 1460.-11(b)(4) (1978). The Board's regulations also state, and this court has emphasized on several occasions, that return on capital is not a very useful factor when the contractor is not in a capital-intensive industry. *See* 32 C.F.R. § 1460.11(b)(4) (1978) (when contractor's main contribution is management of resources, less credit given); *id.* at 1490.10(b) (1978) (factor of "capital em-

ployed" generally not useful for subcontractors who are not capital-intensive firms); *A. C. Ball Co. v. United States*, 531 F.2d 993, 1011, 209 Ct.Cl. 223, 255–56 (1976); *Mills Mfg. Corp. v. United States*, 571 F.2d 1162, 1173, 215 Ct.Cl. 536, 557 (1978). Here, the facts indicate that capital investment in shoe production was generally low. In addition, Bata Shoe's profits correspond with a largely increased volume produced by an increased utilization of existing presses and by extensive training of labor. These facts lead to the conclusion, as in *Mills Manufacturing Corp.*, that net worth and capital returns are not the most useful indices by which to judge Bata's profits. *Mills Mfg. Corp. v. United States*, 571 F.2d 1162, 1173, 215 Ct.Cl. 536, 557 (1978). In addition, Bata deviated from the general industry trend by relying more heavily on capital equipment, the Union presses. Thus, any comparison must be adjusted for this difference. Still, a comparison of Bata's return on net worth and capital cannot be totally disregarded. *Cf. Manufacturers Service Co. v. United States*, 582 F.2d 561, 572–73 n. 20, 217 Ct.Cl. —— (1978) (although court cannot rely completely on profit-sales ratios compared with IRS data, court reluctant to disregard information totally), Bata's return on net worth was 78 percent and its return on capital was 55 percent for 1967. This contrasts with the FTC's report on return on stockholder's equity (presumably net worth) for "leather and leather products" manufacturers which listed an 11.8 percent after-tax return in 1967. The Dun and Bradstreet median figures for "shoe manufacturers" shows an 8.9 percent return on "tangible net worth" and a 12.9 percent return on "net working capital." The Renegotiation Board's figures for other combat boot manufacturers reveal a range of returns on net worth from 1%–135% in 1967 (excluding one return of over 2,000 percent) and returns on capital ranging from .7%–69%. The trial judge, with good reason, was very skeptical of those figures because of the different capital structures of various companies and the extremely wide range of variations in the Renegotiation Board's figures. It is enough

to note that Bata's return on net worth and capital far exceeded any other figure except for the uppermost ranges for other combat boot manufacturers. Even in that category, Bata's rates of return rank among the highest in the group.

The trial judge, after totally discounting all comparative returns on net worth and capital, awarded Bata Shoe favorable consideration under capital employed because Bata was totally self-financed. Although the regulations and this court have recognized the extent of self-financed business as an important consideration in proper circumstances, we are dubious that this factor is very significant in this case because of the comparatively high range of plaintiff's returns on net worth and capital. *See* 32 C.F.R. § 1460.11(b)(4) (1978); *Aero Spacelines, Inc. v. United States*, 530 F.2d 324, 351–52, 208 Ct.Cl. 704, 749–50 (1976). The evaluation of capital employed, as with the factors of efficiency and reasonable costs and profits, must if possible be made in relative terms. The Board's regulations which concern the factor of self-financing underscore the comparative nature of credit for self-financed business:

> A contractor who is not dependent upon Government or customer financing of any type is entitled to *more favorable consideration than* a contractor who is largely dependent upon these sources of capital. 32 C.F.R. § 1460.11(b)(4) (1978) (emphasis added).

In *Aero Spacelines*, the court relied upon the contractor's self-financed operations in the absence of any comparative data and only to conclude that defendant had failed to prove that the contractor's profits were excessive under the capital employed factor. 530 F.2d 324, 351–53, 208 Ct.Cl. 714, 749–52 (1976). Further, the importance of self-financing is substantially diminished when, as here, the industry is not a capital-intensive industry. *See Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 507–08, 211 Ct.Cl. 110, 125–26 (1976) (evaluation

of net worth neutral when large part of business value was proprietor's personal knowledge).

▮▮▮ Thus, while Bata Shoe receives some consideration for its self-financed operations, overall it is entitled to relatively little credit on this factor in light of the returns on net worth and capital of comparable firms, which serve as a warning light alerting to the possibility that Bata's returns were excessive.[9]

### D. *Extent of risk assumed*

▮▮▮ Section 103(e) of the Act recognizes that the "[e]xtent of risk assumed, including the risk incident to reasonable pricing policies * * * " is a factor which must be taken into account in determining whether a contractor has realized excessive profits in its dealings with the government. Without some assurance to defense contractors of compensation for performance of risky undertakings, the government may have a dearth of qualified applicants.

Conducting business under firm fixed-price contracts is a business risk that has been recognized by the court. *See A. C. Ball Co. v. United States*, 531 F.2d 993, 1007, 209 Ct.Cl. 223, 249 (1976); *Aero Spacelines, Inc. v. United States*, 530 F.2d 324, 349, 208 Ct.Cl. 704, 745–46 (1976). All of plaintiff's contracts were firm fixed-price contracts, but this does not alone automatically entitle it to favorable consideration. As in *Manufacturers Service Co.*, there are facts here which mitigate the usual risks inhering in a fixed-price contract. First, the contracts were relatively short term, spaced at six-month intervals. Second, the nature of bidding for the 1966 contracts, which accounted for over two-thirds of plaintiff's 1967 sales, shows that Bata Shoe had considerable leeway in fixing the final price. In both 1966 procurements the government rejected only one or two bidders, and in each contract Bata's price was the highest among the six accepted bids. *See Manufacturers Service Co. v.*

---

**9.** Again, a "sideways glance" at the Renegotiation Board's decision reveals that although the Board calculated rates of return on net worth and capital which were lower than our figures, it still concluded that Bata Shoe's rates were high and "an indication of excessive profits."

*United States*, 582 F.2d 561, 576, 217 Ct.Cl. —— (1978).

Other facts, however, suggest that Bata is entitled to favorable consideration under the risk factor on other grounds. In its consideration of this factor, the Board gave plaintiff favorable consideration because it attributed some of the loss suffered in 1968 to be a result of the plaintiff's last tropical boot contract in 1967—a straight bid contract at prices nearly one-third lower than previous tropical boot contracts. The Board felt that Bata was entitled to some credit for its willingness to undertake a close pricing policy. *See A. C. Ball Co. v. United States*, 531 F.2d 993, 1009–10, 209 Ct.Cl. 223, 253 (1976). We agree. But the Board was unwilling to give credit for the risk posed by the loss of civilian markets. On that point we have a different view. A significant risk for those who undertake government work, and one that Bata experienced, is the risk that its civilian markets will evaporate as production capacity is diverted to and preempted by defense needs. This risk is recognized in the Board regulations which state that "[I]n some cases a substantial degree of risk will be found in the temporary sacrifice of civilian markets to competitors, in order to accept more defense orders * * *." 32 C.F.R. § 1460.-12(b)(1) (1978).

Because of its complete concentration on discharging its defense contracts Bata lost, at least temporarily, its civilian markets for leather footwear the production of which it abandoned in May 1966. Defendant's efforts to prove that Bata's abandonment of its civilian leather footwear business had causes other than its preoccupation with

tropical boots production are not convincing. Plaintiff is therefore entitled to some favorable consideration for the risks taken and detriment suffered.

Bata's decision in May 1966 to abandon civilian leather footwear was caused primarily by the prospect of an all-out effort to perform defense contracts for boots, for both patriotic and profit motives, and was based upon lengthy consideration of the pro's and con's by the board of directors. It meant an interruption of its many years in the civilian leather footwear market and the opposition of its largest customers, one of whom deserted Bata and had not returned as a customer at trial time. *Cf. Major Coat Co. v. United States*, 543 F.2d 97, 119, 211 Ct.Cl. 1, 39–40 (1976).[10]

While trends toward greater imports and style changes existed during the relevant time periods, and while they appear to have affected the profitability of plaintiff's operations, defendant has not shown that they were the prime cause of Bata's cessation of production of civilian leather footwear. Instead, the evidence shows a company working hard to overcome financial set-backs in civilian leather, but one that could not overcome the adverse effects of a labor drain caused by the necessity to use its skilled workers for the manufacture of military boots. Bata clearly faced the risk of losing its commercial markets, and it was, in fact, a risk that was altogether too real.

Finally, it is felt that the plaintiff's peak years of tropical combat boot production in 1966 and 1967 synchronized with and were the cause of a decline of profits at Salem (with civilian production) in those years.

10. Defendant's economic expert, Dr. Glass, found that plaintiff was entitled to no credit for the risk of abandoning civilian markets. Dr. Glass (and apparently the Board) felt that Bata Shoe's decision to abandon the civilian leather market was minimizing a risk, since the civilian market at the time was severely depressed. But it is not enough to say, as Dr. Glass did, that Bata actually minimized its risks by abandoning civilian production in favor of military production. Bata had a large investment in time and reputation in the civilian leather footwear market and had a right and the intention to maintain that market. It surrendered that

right in order to increase its production of tropical combat boots at a time when the government was in desperate need of them. For this risk, and its realization, Bata is entitled to retain more profits than it would have been entitled to retain absent the risk. *See Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 508, 211 Ct.Cl. 110, 126 (1976) (although contractor's decision to abandon all civilian business in favor of military contracts was made to maximize profits, contractor still entitled to credit for risking entire business on one customer).

Salem acquired Belcamp's less efficient Cenel presses in exchange for transferring its more efficient Union presses to Belcamp to expedite performance of the latter's boot contracts, thereby causing costly dislocations and inefficiencies at the Salem plant, as well as expenditures to adapt the Cenel presses and molds to the Salem production requirements. Since the financial health of the parent corporation is equal to the net sum of its subsidiaries' well-being, it is manifest that in benefiting Belcamp by impairing Salem the plaintiff was taking a realized risk that is to be given credit as a risk factor in the renegotiation criteria.

Accordingly, we conclude that plaintiff is entitled to favorable consideration for risks, although the precise quantification of this credit eludes us.

### E. Contribution to the defense effort

■ Among the prescribed statutory factors is the "[n]ature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance * * *." 50 U.S.C. App. § 1213(e)(4) (1970). Renegotiation Board regulations elaborate that favorable consideration under this factor requires more than timely, satisfactory performance of a defense contract. Examples of the more exemplary performance cited by the Board's regulations include "superior performances in excess of contract requirements," use of "new inventions, techniques, and processes of unusual merit," and "cooperation with the Government" in developmental work. 32 C.F.R. § 1460.13(b) (1978); see Mason & Hanger-Silas Mason Co. v. United States, 518 F.2d 1314, 1354–55, 207 Ct.Cl. 106, 128–29 (1975) quoted in Major Coat Co. v. United States, 543 F.2d 97, 119–20, 211 Ct.Cl. 1, 40 (1976). Plaintiff has presented evidence in each of these three areas and requests favorable consideration as to each. (In its statement of facts and reasons as to this case the Board gave plaintiff favorable consideration for its contribution to the defense effort because of the research and

development assistance Bata gave to the government.)

Plaintiff's first ground for claiming favorable credit is that it rendered "superior performance in excess of contract requirements." The record does show that Bata Shoe was the largest single producer of tropical combat boots, that it delivered 61 percent more boots than required by delivery schedules in 1967, and that it had a very low rejection rate. Bata also received several government letters of commendation and was the only combat boot manufacturer to receive a Quality Award in 1967. However, we are uncertain how much credit should be given on this score. Again, there is a paucity of evidence of the comparative achievements of other combat boot manufacturers, although the record reveals that several other contractors also received commendation letters. And although the contractor in Blue Bell had a very similar record of a high quality performance, we found such evidence best considered under other factors. Blue Bell, Inc. v. United States, 556 F.2d 1118, 1140, 213 Ct.Cl. 442, 479 (1977). In the absence of comparative information about the deliveries, rejection rates, and government recognition of other combat boot manufacturers, we conclude that Bata Shoe is entitled to some favorable credit for a "superior performance"; but it goes almost without saying that we cannot weigh too heavily facts which have already provided the basis for favorable consideration under the factor of efficiency.

Bata Shoe is entitled to some favorable credit for its contributions of "new inventions, techniques, and processes of unusual merit"—particularly the Union press. In spite of the fact that the Union press was uniquely adapted to the manufacture of vulcanized combat boots, plaintiff was the only firm to use it. Although it was not necessary to employ a Union press in order to produce boots of sufficient quality to satisfy the government's needs, the Union press was of "unusual merit" in the production of vulcanized combat boots because of the increased efficiency it brought to bear in the manufacture of a product in extremely short supply. Both the Board and

the trial judge concluded plaintiff was entitled to some favorable credit in this area, and we agree.

Plaintiff asserts that it is also entitled to favorable consideration for contribution to the defense effort because of its cooperation with the government. Although it has been shown that Bata did indeed work with the government in developmental work and in the course of production of the combat boot, most of this cooperative effort occurred during the six years prior to the renegotiable year 1967. Furthermore, plaintiff's efforts in this regard were not distinguishable from those of the other contractors making tropical combat boots. Special credit to Bata over its competitors in this regard is not due. Bata is nevertheless entitled to some credit for contributing to the defense effort by its "superior performance" and for utilizing "inventions, techniques, and processes of unusual merit"; neither party has suggested a method for or numerical calculation of how much credit Bata Shoe should have.

F. *Character of business*

■ Another statutory factor is the contractor's "[c]haracter of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover * * *." 50 U.S.C. App. § 1213(e) (1970). This court has stated that the primary consideration here is " * * * value added. How much value did plaintiff add to the raw materials and services it purchased?" *Butkin Precision Mfg. Corp. v. United States,* 544 F.2d 499, 509, 211 Ct.Cl. 110, 129 (1976). As the court said in *Butkin* and more recently emphasized in *Tool Products,* value added depends on data showing the relative contribution of the manufacturer to the final cost of the product: what did plaintiff's own labor add to the raw materials and other services? 544 F.2d at 509–10, 211 Ct.Cl. at 129; *Tool Products Co. v. United States,* 589 F.2d 506, at 510–511 (Ct.Cl.1978). Here, as in *Butkin,* such comparative figures are lacking. Although the Renegotiation Board's decision cited a fig-

ure of 62.2 percent as the value of raw materials in the combat boots, we cannot rely on this figure without knowing how it was derived.

The facts do indicate that the manufacturing process was very complex. The parties have stipulated that production of the vulcanized tropical combat boot involved a more complex manufacturing technique than was required by the traditional all-leather boots. The process for tropical combat boots was also more complex than that used to produce plaintiff's civilian leather boots and shoes. Many factors, including the need for extensive inspections, additional training courses, and the precision required by exacting government specifications created this complexity. Defendant argues that this complexity does not entitle Bata to favorable consideration. The contention is that the prior manufacturing process for combat boots (the Goodyear Welt boot) was much more complex than the current vulcanizing process that Bata and others were utilizing, and that therefore Bata was not entitled to favorable consideration. However, not only are the facts inadequate to prove that the Goodyear Welt process was more complex, but as the trial judge found: "even if that were the case defendant has not shown that the vulcanized tropical combat boot was not exceedingly complex to manufacture or that plaintiff is not entitled to favorable consideration on that account."

Granting that the vulcanized combat boot process was very complex does not, however, mechanically entitle Bata Shoe to an additional upward monetary adjustment. Rather, as the court commented in *Major Coat:*

> * * * consideration of production complexity is in reality the assessment and comparison of "[t]he relative complexity of the manufacturing technique," as the board states in the regulation just cited [32 C.F.R. § 1460.14(b)(1) (1978)]. The term "relative" is the key: a comparison of degrees of manufacturing complexity is anticipated, between plaintiff and those firms against whose profit lev-

els plaintiff's will be measured, to ascertain that plaintiff's performance will not be compared with that of a firm not encumbered by similar complications, or at least that plaintiff *will not be so compared* without making appropriate adjustments. The assessment of the degree of production complexity is not of itself a vehicle for granting rewards or withholding them, but simply lays the foundation for a later comparison. 543 F.2d 97, 105, 211 Ct.Cl. 1, 14–15 (1976).

*See also Butkin Precision Mfg. Corp. v. United States,* 544 F.2d 499, 510, 211 Ct.Cl. 110, 129 (1976) (although plaintiff showed its work was difficult " * * * we do not think that difficulty is *per se* what Congress had in mind"); *Camel Mfg. Co. v. United States,* 572 F.2d 280, 307, 215 Ct.Cl. 460, 508 (1978) (plaintiff's complex manufacturing process entitled to credit only when compared with plaintiff's base-year profits or with commercial profits). The comparative or quantitative information is not at all precise on this element of complexity. Thus, although we accept the trial judge's finding that Bata Shoe deserves some bonus for its complex manufacturing effort, we have to evaluate the extent of this credit as part of the process of comparing Bata's profit record with other profit data and of arriving at the determination of excess profits.

### IV.

■ In assessing the ultimate reasonableness of Bata Shoe's profits, we have started with an initial point of reasonable return on sales of 10–11 percent, as discussed *supra* in Part II. A 10.5 percent return on renegotiable sales of $15,199,924 would yield a reasonable profit level of approximately $1,596,000. (Bata's actual renegotiable profits were $2,533,560). From this "starting point" we have considered the statutory factors, finding that plaintiff is entitled to some credit under each. As we have explained, our position on the amount of credit plaintiff earned is necessarily affected by considerable uncertainty due to the lack of relevant comparative data. We know Bata Shoe was effi-

cient, but how much more efficient was Bata than any other combat boot manufacturer? Similarly, Bata's costs seem reasonable and its depreciation policy probably saved the government some money, but how much more cost savings did the government obtain from Bata than from other manufacturers? The risks Bata Shoe assumed in dropping a commercial line of leather shoe business and disrupting its Salem plant operation are impressive, although Bata was also avoiding a depressed civilian market in shifting to the military market with its certain demand. Bata's inventive contribution to the defense effort is unquestioned, and some credit for its superior performance, with care to avoid double-counting this element, is also due. Finally, the complexity of Bata's business is favorable, but again we are haunted by the lack of any hard data on the value added by Bata Shoe's efforts.

Neither party has suggested a method of quantifying any individual factor. The defendant, relying on its expert who started with a profit rate of 4.97 percent, suggests we credit plaintiff by selecting a multiplier of two. Thus, defendant concludes Bata Shoe is entitled to a final return on sales of only 9.94 percent, (2 times 4.97 percent), yielding excess profits of approximately $1,080,000. We reject defendant's method of quantifying the statutory factors in aggregate because we take a more positive view of some of the statutory factors than defendant or its expert. Further, defendant gives us no explanation for the selection of two as a multiplier—a multiplier which if applied to our starting point of 10.5 percent would yield a return on sales of 21 percent.

Plaintiff, of course, suggests that the appropriate quantification of the statutory factors is a clearance of its 16.7 percent return. We reject this first because our review of the statutory factors reveals that the total credit for the statutory factors is not so strong as to merit a clearance. The comparative indices we have (profit-to-sales, net worth, return on capital), together with evidence of a wartime demand which temporarily created noncompetitive

market conditions, indicate that Bata Shoe's 1967 profits were excessive. The profit-to-sales index, if based on FTC, IRS, or Dun and Bradstreet data shows that Bata made profits approximately three times the industry averages. The profit-to-sales index based on the experience of other combat boot manufacturers shows that all companies except Bata Shoe (and one other company) made profits of no greater than 11.7 percent.[11] Similarly, both the net worth and capital return indices show that (using FTC or Dun and Bradstreet data) Bata's returns were high, and, using Renegotiation Board data, Bata's returns were among the highest. This was a period of intense military demand for tropical combat boots—a demand so intense that the Government in 1966 abandoned its normal procurement methods and accepted almost any bid. In the two 1966 contracts which account for two-thirds of Bata's 1967 deliveries, Bata was the highest bidder with average unit prices ranging from a low of $12.03 to $14.55. To quote again from *Mason & Hanger-Silas Mason,* the very premise of statutory renegotiation is that "accurate pricing and the control of contractors' profits cannot be achieved during a build-up of production for defense of war." *Mason & Hanger-Silas Mason Co. v. United States,*

518 F.2d 1341, 1346–47, 207 Ct.Cl. 106, 115 (1975) *quoted in Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1167–68, 215 Ct.Cl. 536, 546–549 (1978); *Manufacturers Service Co. v. United States,* 582 F.2d 561, 573, 217 Ct.Cl. —— (1978). This premise applies to the wartime market demand for tropical combat boots in 1967.[12]

Thus, we are left in the not unfamiliar position of arriving at some rough quantification of the excess profits we are certain existed. *See, e. g., Manufacturers Service Co. v. United States,* 582 F.2d 561, 577, 217 Ct.Cl. —— (1978); *Mills Manufacturing Corp. v. United States,* 571 F.2d 1162, 1179–80, 215 Ct.Cl. 536, 569–572 (1978); *Major Coat Co. v. United States,* 543 F.2d 97, 124, 211 Ct.Cl. 1, 48–49 (1976). Unlike some renegotiation cases, we lack in this instance any positive method of quantifying individual statutory factors. *Cf. Butkin Precision Mfg. Corp. v. United States,* 544 F.2d 499, 506, 211 Ct.Cl. 110, 122–23 (1976) (efficiency measured by percentage of renegotiable sales saved by plaintiff's lower prices); *Page-River-Curran v. United States,* 574 F.2d 1063, 216 Ct.Cl. —— (1978) (reasonableness of profits gauged in relation to estimated profits in single fixed-price contract).[13] But we are satisfied

---

11. As indicated earlier, this 11 percent figure includes one company whose profits were renegotiated from an initial return of 16.9 percent to 11.1 percent.

12. As noted earlier, Bata Shoe was the highest bidder in two 1966 contracts which were not

competitively bid contracts. These 1966 contracts accounted for two-thirds of Bata's 1967 deliveries. When demand for tropical combat boots began to abate in 1967 the military shifted to competitively bid contracts, and average unit prices, particularly Bata Shoe's prices, dropped dramatically. This drop in prices is illustrated by the following comparison:

| December 1966 Contract (Average price: $13.44) | | June 1967 Contract (Average price: $9.74) | |
|---|---|---|---|
| Contractor | Average Unit price | Contractor | Average Unit price |
| Safety (Genesco) | 12.61 | Bata | 9.41 |
| Hi-Pals | 13.35 | Safety (Genesco) | 9.76 |
| International | 13.26 | Endicott-Johnson | 9.86 |
| McRae | 13.60 | Randolph | 9.94 |
| Randolph | 13.90 | | |
| Bata | 13.92 | | |

The dramatic reduction of prices within six months for the same product at comparable volumes strongly indicates that earlier pricing under the negotiated bid system had been dis-

torted by wartime demands—the premise of the renegotiation system.

13. Even with the aid of additional data, it is difficult to quantify the exact credit to be ac-

that Bata made some substantial excessive profits in 1967. We must therefore apply the now-proverbial "broad brush" approach to fulfill the congressional mandate requiring a *de novo* determination of excess profits. *E. g., A. C. Ball Co. v. United States,* 531 F.2d 993, 996, 209 Ct.Cl. 223, 229 (1976); *Camel Mfg. Co. v. United States,* 572 F.2d 280, 310, 215 Ct.Cl. 460, 512 (1978); *Manufacturers Service Co. v. United States,* 582 F.2d 561, 577, 217 Ct.Cl. —— (1978). We have concluded that for the review year an appropriate award for plaintiff's statutory factor credit is an overall addition of somewhat less than half of our "starting point" of 10.5 percent of sales—an increment of 4 percent. This means that plaintiff is entitled to a total 14.5 percent return on renegotiable sales, a figure of approximately $2,204,000. Plaintiff actually made a profit of $2,533,560. On that basis, plaintiff's excess profits are computed to be the rounded difference of those two sums, $330,000.

## CONCLUSION OF LAW

The court concludes as a matter of law that for the 1967 fiscal year plaintiff realized excessive profits of $330,000 from contracts subject to renegotiation under the Renegotiation Act of 1951, as amended. Judgment is hereby rendered on defendant's counterclaim in the sum of three hundred thirty thousand dollars ($330,000), less appropriate state and federal tax credits, plus interest thereon as provided by law.

corded to individual statutory factors. *E. g., Page-River-Curran v. United States,* 574 F.2d 1063, 1066, 216 Ct.Cl. —— (1978) (expressing doubts as to trial judge's percentage adjustments for individual statutory factors); *Tool Products Co. v. United States,* 589 F.2d 506, at 513 (Ct.Cl.1978) (Davis, J., concurring). Of course, the statute does not require assignment of percentage values to each individual statutory factor. *See Page-River-Curran v. United States,* 574 F.2d 1063, 1067, 216 Ct.Cl. —— (1978) *citing Camel Mfg. Co. v. United States,* 572 F.2d 280, 310, 215 Ct.Cl. 460, 512 (1978).