SHINN ENGINEERING, INC.

v.

The UNITED STATES.

Nos. 678–71, 238–72.

United States Court of Claims.

Nov. 14, 1979.

As Amended Feb. 1, 1979

Charles J. Schufreider, Los Angeles, Cal., attorney of record, for plaintiff. Robert H. Klugman and Voegelin & Barton, Los Angeles, Cal., of counsel.

Maryann Clifford, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant. C. Max Vassanelli, Dennis G. Linder, Washington, D.C., and Don W. Crockett, Renegotiation Board, Washington, D.C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## OPINION

DAVIS, Judge.

Plaintiff, Shinn Engineering, Inc. ("Shinn"), seeks de novo review of Renegotiation Board findings of excessive profits for 1967 and 1968.[1] *See* Renegotiation Act of 1951, 50 U.S.C. App. §§ 1211–1233 (1976). The administrative determination was that Shinn made excessive profits of $150,000 in 1967 and $350,000 in 1968. Trial Judge Harkins, finding defendant had failed to meet its burden of proof, concluded that the company's renegotiable profits were not shown to be excessive and recommended a

---

1. The Board reviewed profits on the basis of Shinn's 1967 and 1968 fiscal years. All subsequent references are to these fiscal years.

clearance for both years. Defendant seeks from us excessive profit determinations of some $407,000 in 1967 and $568,000 in 1968. Its primary contention at this appellate stage, as at trial, is that the analysis made by its economic expert compels that result. Plaintiff vigorously assails the expert's economic model, and asks affirmance of the trial judge's conclusion. Upon review of all the evidence we find that plaintiff did make some excessive profits, though not at the levels determined by the Board or urged by defendant. We conclude that Shinn realized excessive profits of $73,000 in 1967 and $231,000 in 1968.[2]

## I. Company Background

Shinn Engineering, Inc., was founded in 1950 as a sole proprietorship by Clifford Shinn, who, in 1952, incorporated it in California. Until the merger in 1969 with Macrodyne, Incorporated, Shinn was dominated by its founder, president, and majority stockholder, Clifford Shinn.

Shinn's history reflects growth problems typical of small businesses. By 1960, Shinn had grown sufficiently to attempt a takeover of another small company, Universal Ecsco. This acquisition did not prosper and until 1963, when Ecsco's contracts were sold, resulted in management problems and financial difficulties. During the years 1964 and 1965, Shinn's accounts receivable were being factored and all of its assets, including its capital equipment and inventory, were pledged for operating capital.

In late 1964, Shinn expanded operations to Grand Prairie, Texas. Initial startup costs of the Texas facility were $100,000 and, in its first year of operation, a $73,000 loss was incurred. Thereafter, Shinn's business improved and, by the review years, 1967 and 1968, Shinn had expanded to a multi-plant operation in Grand Prairie, Texas; Santa Ana, California; and El Cajon, California. Shinn employed 120 workers at the end of 1966, the number was 167 in 1967, and 209 at the end of 1968. During the period 1962 through 1968, Shinn operated under the same management. A common senior management and a common sales force serviced all three manufacturing facilities.

Since 1952, Shinn has been primarily engaged as a job machine shop in profile and contour milling of aircraft structural parts and aerospace components. Nearly all of Shinn's profile and contour milling work was done as a subcontractor to customer blueprints and specifications. Shinn's customers were entities with prime contracts from the Government or from commercial interests. All of Shinn's renegotiable and commercial subcontracts were on a fixed-price basis with guaranteed delivery dates, and normally the materials fabricated were customer-supplied. None of Shinn's capital equipment was Government- or customer-supplied, and Shinn did not utilize Government loans or receive progress payments on its renegotiable contracts.

Contour and profile milling of aircraft parts and aerospace components is complex precision work that requires adherence to close tolerances, complicated blueprints, and detailed Government specifications. Dimensional tolerances usually were plus or minus $5/1000$ of an inch and, on occasion, tolerances of plus or minus $1/1000$ of an inch were required. Parts to be machined could have had as many as 300 dimensions. Shinn's work included structural parts for the Northrup T38 and the Northrup F5 airplanes, the F–111 and F–4 fighter planes, and aerospace components for NASA in connection with the Lunar Excursion Module (LEM) and the Saturn moonshot project.

During the period 1965 through 1968, manufacturing equipment utilized by Shinn increased in complexity and productivity. The standard milling equipment was the three axis profiler, which required the operator to remove the part from the machine in order to make cuts in the fourth or fifth

2. We adopt, with minor modifications, the trial judge's findings of fact which are not printed with this opinion. We have also borrowed parts of the trial judge's opinion. See our or- der of this date for the text of the modifications in the findings. Any additional statement of fact in this opinion is also made part of our findings.

plane. In late 1964, Shinn began to develop multiple axis equipment that would permit the machine operator to control cuts in a fourth and fifth plane without removing the part from the profiler. Shinn developed and patented a system of hydraulically driven cams that permitted control of operations on the fourth and fifth axis.[3] The hydraulic cam mechanism on the five axis profiler allowed cuts in the fourth and fifth plane to be preset and reduced the possibility of error with respect to such cuts. Shinn also developed multiple spindle profilers that allowed multiple parts to be manufactured in one operation.

In 1964 and 1965, Shinn had one prototype five axis machine and, in 1964, Shinn had no multiple spindle equipment. Multiple axis, multiple spindle equipment first came into use in late 1965. By September 1968, Shinn had in use 45 machines that employed these techniques.[4]

The bulk of Shinn's equipment was not purchased off-the-shelf. Shinn made its production equipment by conversion of old equipment and from scrap. The profiling equipment used by Shinn in the review years largely was the product of Shinn's "in-house" effort and it was converted by Shinn's employees from salvage and scrap materials. This procedure of rebuilding old machines had been utilized by Shinn throughout its existence.

In addition to increasing machine complexity, the materials utilized in the aerospace industry changed. Before 1965, aluminum was the primary material used to fabricate structural parts manufactured by Shinn. After 1965, stainless steel and titanium, which are more difficult to machine and which require longer production times, came into use.

From 1962 to 1968 Shinn's total sales grew steadily; its renegotiable sales also grew substantially. Shinn likewise experienced an increasing (with some fluctuations) amount of commercial business. As a percentage of total sales, commercial sales increased from 11 percent in 1965 to 37 percent in 1968. Shinn's profits on renegotiable business fluctuated, varying principally with the volume of renegotiation work. In 1966–68, when Shinn had renegotiable sales of $2.7–4.8 million, it had profit rates on sales of 17–23 percent. In 1970–73, when Shinn's renegotiable sales declined to a range of $1.9 million to $340,000, it suffered losses.[5]

II. *Accounting Issues* *

There are two accounting issues which we consider first. Both involve allocation of costs and expenses between renegotiable and nonrenegotiable business. The "weighted guidelines" issue allocates certain overhead costs (indirect manufacturing expense) and operating expense (selling and advertising, and general and administrative) and applies to both 1967 and 1968. The "mean average rate" issue adjusts allocations of cost of inventories to renegotiable business and applies only to 1968. The accounting issues apply only to the computation of the amount of excessive profits, if any, and have no effect on the consideration of the statutory factors. Were plaintiff's contentions to prevail, the weighted factors issue would reduce Shinn's profits on renegotiable business by $64,335 in 1967, and by $125,375 in 1968, and the mean average rate issue would reduce Shinn's profit on renegotiable business in 1968 by an additional $25,860.

3. In a four axis operation, in addition to cutting the part in three dimensions on the x, y, and z axes, the part is simultaneously moved in the "y mode," which allows four dimensional machining. In a five axis operation, the part is moved simultaneously in both the x and y modes to allow machining on five planes.

4. The record does not reveal the exact date of deployment of machines during these years.

5. Similarly, in the years preceding the 1966–68 high-volume period, Shinn with renegotiable sales of $1.1–1.9 million earned returns (measured by profits to renegotiable sales) of 4.7–10.3%.

* This part of our opinion is taken directly (with minor modifications) from Trial Judge Harkins' recommended opinion. Neither party excepted to the trial judge's opinion on these accounting issues.

In its original filing for 1967, and for all years prior thereto, Shinn had allocated its indirect manufacturing expense on the basis of direct labor hour ratios, and had allocated operating expense on the basis of cost of sales ratios. Shinn's amended 1967 filing and its original 1968 filing used "weighted factors" on some of these costs.

In summary, Shinn's weighted factor adjustment reflects a management estimate that renegotiable work incurred certain overhead costs and operating expense to a greater extent than its nonrenegotiable, commercial business. Shinn's mean average rate adjustment, through a complicated formula, allocates direct labor and indirect manufacturing expenses associated with inventory produced in the preceding year and used in the review year.

Shinn's contentions on both accounting issues are novel and do not reflect accepted accounting practices. Percentages promulgated by Shinn's management on the weighted guidelines cannot be verified from information in Shinn's books and records. Neither Shinn's accountant nor the FBI auditor found information that would support validity of the percentages used in the weighted factors; neither could testify as to any other company that employed a weighted factor system of cost allocation. Shinn, in its original FY 1967 filing and in its previous filings, had allocated costs in accordance with applicable Renegotiation Board regulations. It may be that weighted factors could allocate costs in an acceptable manner provided there was adequate support. The changes sought by Shinn, however, should come from the board. It is not the court's business to inject novel accounting practices, even though theoretically acceptable, in the absence of prior board rulemaking and on a record devoid of supporting documentation that would establish actual costs involved.

Even less can be said for the mean average rate adjustment. None of Shinn's inventory allocations prior to 1968 had used the mean average rate concept. Shinn does not have the sophisticated cost accounting system that is necessary to support its adoption, and it is not an acceptable accounting practice. The FBI auditor was aware of no other company that employed such an adjustment to inventory costs. Accordingly, Shinn's contentions on both accounting issues are rejected.

III. *Nature of Our Review for Excessive Profits in This Case*

■ This is yet another renegotiation case, tried before the leading decision in *Major Coat Co. v. United States*, 543 F.2d 97, 124, 211 Ct.Cl. 1, 48 (1976), in which the court's consideration of excessive profits can be more lenient toward the defendant than it might be under a strict application of the burden of proof set forth in *Lykes Bros. S. S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972). *See Blue Bell, Inc. v. United States*, 556 F.2d 1118, 1124, 213 Ct.Cl. 442, 450 (1977); *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643, 647–48 (1977); *Camel Mfg. Co. v. United States*, 572 F.2d 280, 307, 310, 215 Ct.Cl. 460, 509–10, 514 (1978); *Mills Mfg. Corp. v. United States*, 571 F.2d 1162, 1180, 215 Ct.Cl. 536, 571 (1978); *Manufacturers Service Co. v. United States*, 582 F.2d 561, 577, 217 Ct.Cl. —— (1978); *Tool Products Co. v. United States*, 589 F.2d 506, 508, 218 Ct.Cl. —— (1978); *Bata Shoe Co. v. United States*, 595 F.2d 9, 14, 219 Ct.Cl. —— (1979). In these pre-*Major Coat* cases, the court must satisfy itself from the whole record, before ordering a refund, that excessive profits were in fact made in the review period,[6] but the defendant is not held to precise proof of the amount of that excessive gain. By the same token, the court will do the best it can in ascribing monetary value or credit to the statutory factors which have been shown or conceded to exist—despite the absence of solid proof as to quantities, amounts, or values. Conversely, plaintiff does not automatically obtain a clearance simply because we reject the Government's presentation

---

**6.** There is no contention that plaintiff failed to make a prima facie case. The trial judge correctly found that Shinn presented evidence with respect to the statutory factors and thus met its burden of going forward with proof of a prima facie case.

and the views of its expert. The record itself must prevail if it shows that there were refundable excessive profits.

It is in this light that we consider, *first,* the "starting point" from which we shall determine whether excessive profits were made in the review years, *second,* the application of the statutory factors, and *third,* the existence and amount of excessive profits.

## IV. *The "Starting Point"*

■ Defendant's expert, Dr. Mock, selected the two-year period of 1964 and 1965 as the proper historical norm and "starting point" for considering whether excessive profits were made in the review years, 1967 and 1968. Though we accept and adopt for this case the "starting point" method (*see Bata Shoe Co. v. United States,* 595 F.2d 9, 12–13, 219 Ct.Cl. —— (1979)), we reject Dr. Mock's particular choice of years because it omits 1966. In our view 1966 was more closely comparable to the review years— Shinn's new multiple axis, multiple spindle machines were being deployed, apparently in substantial numbers, and the new, more difficult aircraft materials were being used. Dr. Mock, although initially including 1966 in his base year sample, ultimately excluded

it because Shinn's profits in 1966 were excessive.[7] Shinn's profits in 1966 were quite high, returning 17% on a profit/sales ratio or 50.8% on a profit/capital ratio. These returns represented a substantial increase (a 191% increase in profits/sales, and 235% increase in return on capital) over the prior year, and Shinn's profits in 1966 were deemed excessive (though below the $40,000 minimum required for a redetermination) by the Renegotiation Board. *See* 32 C.F.R. § 1460.5(a) (1978). Nonetheless, because 1966 is a year more closely comparable with the 1967–68 review years we think on balance it should be included in the base period, along with 1964 and 1965. That three-year span offers a fairer and more representative "starting point."[8] As spelled out in Part VI, B, *infra,* plaintiff's average return on sales for 1964–1966 was 12%, its return on capital was 31.7%, and its return on net worth was 73.7%.[9]

## V. *Statutory Factors*

■ The Renegotiation Act sets out various factors to be considered in evaluating a firm's profits.[10] Defendant concedes that Shinn is entitled to favorable or very favor-

---

**7.** Dr. Mock testified that in arriving at proper base years he excluded years of excessive profits caused by the "effects of a wartime build up." Without explaining his reasons in detail, Dr. Mock stated that 1966 presented "problems" for him in this regard.

**8.** As noted in Part I, *supra,* 1962 and 1963 were unusual years since plaintiff's profits were shackled by an unprofitable acquisition.

**9.** For the review years (taken together), the comparable figures were 21.9%, 59.5%, and 89.8%. *See* Part VI, B, *infra.*

**10.** The statutory factors are contained in the definition of excessive profits (50 U.S.C.App. § 1213(e) (1976)):

"(e) Excessive profits.

"The term 'excessive profits' means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title [sections 1211 to 1224 of this Appendix] to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the

use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

"(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

"(2) The net worth, with particular regard to the amount and source of public and private capital employed;

"(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

"(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

"(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover;

"(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted."

able consideration under each factor.[11] Unfortunately, the record does not provide a method for quantifying the credit to be awarded under each factor. We agree that plaintiff is entitled to favorable credit, but are unable to conclude that this credit alone is sufficient to justify Shinn's high profit margins. *See infra*, Part V, and also Part VI. *Cf. Bata Shoe Co. v. United States*, 595 F.2d 9, 11, 219 Ct.Cl. —— (1979); *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643 (1977). As was stated in *Major Coat*, restated in *Camel Manufacturing*, and most recently repeated in *Bata Shoe*, the statutory factors must, to be useful, be evaluated in a comparative approach. It is not enough for plaintiff to argue (or defendant to concede) that Shinn was "efficient": the question is whether Shinn was so much more efficient than other contractors (or more than itself in the base years) as to justify its higher profits. Without such comparative data, the impact of the statutory factors is necessarily lessened. *See Camel Mfg. Co. v. United States*, 572 F.2d 280, 298, 215 Ct.Cl. 460, 492 (1978); *Bata Shoe Co. v. United States*, 595 F.2d 9, 14, 219 Ct.Cl. —— (1979).

### A. *Efficiency*

Defendant's expert conceded at trial that Shinn was entitled to "very favorable" consideration under this factor. In view of Shinn's low rejection rates for very precise tolerance equipment, on-schedule deliveries for a high volume, and apparent economies in use of manpower and equipment, this concession is warranted. However a caveat must be added. Shinn's premier claim to efficiency rested on its use of multiple axis, multiple spindle machines, which allowed it to produce more parts per worker with greater precision. In comparing Shinn's efficiency in 1967 and 1968 with its efficiency in the earlier base years of 1964–66, we note that these new machines began to be

used sometime in late 1965, presumably increasing in numbers in 1966.[12] Thus, it seems unlikely that increased use (and numbers) of a new machine would by itself make Shinn so much more efficient as to justify the very substantial jump (over prior years) of profits in 1967 and 1968.

### B. *Reasonableness of Costs and Profits*

Defendant also conceded that Shinn's costs were reasonable, stating that Shinn did reduce its unit price on some high-volume items. The evidence does not provide any means for comparing Shinn's price reductions with those of other contractors, or even Shinn's pre-review year pricing policy. Given defendant's concession we can only conclude Shinn's costs were reasonable, at an amount and of a nature unknown.

Shinn's profits on an absolute scale seem quite high, showing a 20.4% return on renegotiable sales (representing a 66.9% return on renegotiable capital) for 1967, and a 23.5% return on renegotiable sales (a 53.1% return on renegotiable capital) for 1968. (A fuller discussion of the reasonableness of plaintiff's profits is contained in part VI, B, *infra*.)

### C. *Net worth and capital employed*

Shinn's capital was derived from private sources, and part of Shinn's capital equipment was composed of profiling machines salvaged by Shinn from scrap materials. Plaintiff is entitled to credit for this; however, as with return on sales, Shinn's absolute returns on net worth and renegotiable capital were quite high. In 1967 Shinn obtained a 93.8% return on renegotiable net worth and a 66.9% return on renegotiable capital. In 1968 the returns on net worth and capital were 85.8% and 53.1% respectively.[13]

### D. *Risk Assumed*

Plaintiff merits favorable consideration for operating under firm, fixed-price contracts in an area requiring very close adher-

---

**11.** Except for the unused sixth factor—other equitable considerations—which neither party has commented on.

**12.** *See* note 4 and accompanying text, *supra*, as well as Part IV, *supra*.

**13.** A more complete comparison of Shinn's rates of return with other companies and its own base-year rate is contained in Part VI, B, *infra*.

ence to tolerance ranges.[14] Plaintiff's president also testified that the aircraft part industry is a risky, cyclical market, and the Renegotiation Board seems to have accepted this. Granting that a cyclical market pattern exposing Shinn to somewhat higher risks, we cannot quantify the extent of risk (or amount of corresponding credit) to which Shinn was exposed.

### E. Contribution to Defense Effort

Shinn deserves favorable credit for two extraordinary contributions. Shinn worked on the lunar landing module, which required very precise work. In addition, Shinn also overcame machining difficulties in producing a liquid hydrogen tank for the moonshot program, difficulties another prior contractor was unable to surmount. See 32 C.F.R. § 1460.13(b)(3) (1978) (providing credit for "overcoming difficulties, which others have failed to overcome, . . .").

### F. Character of Business

Some aspects of Shinn's work in the review years allow it favorable credit under this factor. First, as detailed in Part I, supra, the type of materials worked and complexity of the machining process increased during this time. As with efficiency, we note many of these material and machine changes occurred sometime in 1965, and our use of a 1964–1966 base-year comparison leaves us uncertain of the incremental complexity faced by Shinn in 1967–1968. Second, Shinn continued to increase its use of subcontractors, a factor which the regulations deem worthy of credit. See 32 C.F.R. § 1460.14(b)(3) (1978). However, we have no substantial data on the important index of value added. See Butkin Precision Mfg. Corp. v. United States, 544 F.2d 499, 509–10, 211 Ct.Cl. 110, 129 (1976) quoted in Bata Shoe Co. v. United States, 595 F.2d 9, 22, 219 Ct.Cl. —— (1979). The Renegotiation Board's summary opinion cited statis-

tics indicating Shinn's percentage of added value in the review years declined from the 1965–66 period, but without supporting facts we cannot rely on such unexplained figures.

### G. Summary on Statutory Factors

Plaintiff's evidence and defendant's concessions demonstrate Shinn's entitlement to some favorable credit under each of the statutory factors. However, no evidence provides a means for estimating the proper quantum of credit (in terms, perhaps, of a return on sales percentage) for any individual factor. This compounds the difficulty of the question of whether the statutory factors justify Shinn's high rates of return in the review years—an issue which we now face in Part VI, infra.

### VI. Excessiveness of Shinn's Profits

On this ultimate issue, we first discuss, and decline to accept, the position of the Government's expert supporting a relatively large refund. Then we reject the view of the trial judge and of plaintiff that, defendant's position being discarded, no excessive profits have been shown for either year. Finally, we make our own determination of the amount of excessive profits.

A. Defendant's position: Defendant uses its expert's economic model to demonstrate that even with favorable statutory credit Shinn's profits were still excessive. In brief, the expert, Dr. Mock, produced a model establishing a "normal" profit based on certain prior years of Shinn (1964–1965), adjusting for incremental increases in the rates of return in the review years, and then adding an award for the statutory factors. At this point, Dr. Mock arrives at a reasonable profit figure for the review years which he subtracts from Shinn's actual profits to determine excessive profits.[15] We reject this model on several grounds.

14. The Renegotiation Board discounted this fact somewhat, stating that some of Shinn's contracts in these years were negotiated contracts that followed-up on prior competitively bid contracts. Outside of a single unsupported statement in the Board's decisions, there is no evidence (or even argument) on this point before us.

15. A more detailed description of the mechanics of the Mock approach and the precise mathematical computations is contained in finding 12(a)–(j). At trial plaintiff made a preliminary challenge to Dr. Mock's qualifications, arguing he lacked experience in the aircraft profiling industry. The trial judge rejected this attack as "without merit," finding Dr. Mock's ac-

828

In part IV, *supra*, we have expanded Dr. Mock's base period, which was confined to 1964 and 1965, so as to include 1966. That important change in itself makes his computations unacceptable.

■ A second, significant flaw in the Mock approach is its rigid emphasis on return on capital as a measuring index. Although using the rate of return on capital as a gauge of profits is not per se invalid,[16] the expert's near-exclusive emphasis ignored intangible contributions by Shinn. Shinn's owners and managers contributed more to the operation of this contour and profile milling job shop than the book value of the capital invested. Shinn's management's contribution to the business was more than the scrap value of salvaged hulks, increased by the cost of in-house labor required to fashion them into multiple spindle, multiple axis milling machines. Dr. Mock's return on invested capital does not measure effectively efficiencies provided by Shinn's management and the benefits derived from the in-house development of sophisticated machinery that was superior to equipment then available in the industry. *See Butkin Precision Mfg. Co. v. United States*, 544 F.2d 499, 508, 211 Ct.Cl. 110, 125–26 (1976).

■ Finally, Mock's method of awarding credit for statutory factors—increasing the reasonable profits by a 4% factor derived from the prevailing return on secure U. S. Treasury bills—was arbitrary and inconsistent with the statute. The statute requires additional credit be given for a contractor's exceptional efficiency, risks, defense contributions, etc. To limit a very efficient contractor in a high risk field to a return based on the average return in the most secure investment field contradicts the statutory aim to give particular and due credit for the stated factors.[17]

■ B. *Existence of some excessive profits:* We have pointed out in part III, *supra*, that rejection of defendant's primary theory does not end the suit; in this case tried before *Major Coat* the court is also obliged to review the record and determine if the evidence demonstrates excess profits. Plaintiff fails for the most part to recognize this rule, and the trial judge (probably because his opinion was rendered before the court had made clear its position in pre-*Major Coat* cases) also gave undue weight to his rejection of Dr. Mock's position as decisive.[18] Except for reliance on Shinn's commercial profits (a position we reject *infra*), the trial judge did not, after discarding the Mock theorem, examine to see whether unreasonable gain had been shown on any other basis. We must therefore determine for ourselves whether the record shows the existence of excessive profits.

On that score the evidence is indeed meager, as in other recent cases, and perhaps more so. However, the evidence we do have affirmatively suggests that Shinn's profits, made on military aircraft (and some aerospace projects) during the high-volume Vietnam war period, were excessive. The

knowledged economic expertise combined with a careful study of plaintiff's operations enabled Dr. Mock to understand the aircraft machining industry. We agree.

16. Dr. Mock found return on capital a useful measuring rod for firms which, like Shinn, are capital-intensive. It is true that return on capital is a widely used economic index and at least one commentator has urged its application in the Renegotiation context. *See* Comment, *An Economic Perspective on the Law of Excessive Profits Recovery*, 45 U.Chi.L.Rev. 882, 895 & n. 90, 899–900 (1978); *cf. Mills Mfg. Corp. v. United States*, 571 F.2d 1162, 1171–73, 215 Ct.Cl. 536, 554–57 (1978) (discussing use of return on sales and return on net worth as indices).

17. Further, Dr. Mock's statutory awards were based on an inconsistent formula for 1967 and 1968. For 1967, the award for each factor was 4 percent of the total renegotiable invested capital at risk at the beginning of the review year, i. e., the base period renegotiable capital invested, plus all incremental increases. In the computations for 1968, however, the model allowed, as an award for each factor, only 4 percent of the renegotiable capital invested during 1967. Defendant does not explain this different treatment for the 1968 computation.

18. The trial judge rejected Dr. Mock's testimony on substantially the same grounds as we have rejected it in Part VI, A, *supra*.

only comparative data on profits of other firms is the Internal Revenue Service's Standard Industry Classification (SIC) statistics. We have previously questioned the strength of such industry-wide statistics, once in the precise case of statistics on the aircraft parts industry. *See Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 504, 211 Ct.Cl. 110, 118–19 (1976); *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643, 651–52 (1977). The use of a general IRS classification here is particularly troubling because Shinn moved from one asset category (firms with less than $5 million in assets) to another category ($5–10 million asset firms) between 1967 and 1968. But "merely because comparative data has some weaknesses is no reason to ignore it entirely." *Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 504, 211 Ct.Cl. 110, 119 (1976); *see Camel Mfg. Co. v. United States*, 572 F.2d 280, 302, 215 Ct.Cl. 460, 500 (1978) (retaining two, less reliable, comparative indices as useful in "reconstructing 'normality'"). We reprint the following comparison not as an absolute guide, but as one indicator suggesting that Shinn's profits were probably unreasonable.

| Year | Aircraft Industry Average* | Shinn |
|------|----------------------------|-------|
| 1967 | return on sales = 9.25% | return on sales = 20.4% |
|      | return on capital = 18.3% | return on capital = 66.9% |
|      | return on net worth = 42.4% | return on net worth = 93.8% |
| 1968 | return on sales = 8.9% | return on sales = 23% |
|      | return on capital = 10.5% | return on capital = 53% |
|      | return on net worth = 20% | return on net worth = 85.8% |

\* These figures are taken from defendant's exhibit number 14, which we assume to be approximately correct. As noted in the text, supra, the "decline" in industry returns for 1968 is due to a shift in the sample base from firms with under $5 million in assets to firms with more than $5 million in assets.

---

The other, stronger index for evaluating Shinn's profits is the base years (or "historic norm") approach, which for this case covers 1964–1966. *See* Part IV, *supra*. A table demonstrating the comparison, including the high profits of 1966 in the base period, shows the following:

| Shinn base years' average | Shinn review years' average |
|---------------------------|------------------------------|
| return on sales = 12% | return on sales = 21.9% |
| return on capital = 31.7% | return on capital = 59.5% |
| return on net worth = 73.7% | return on net worth = 89.8% |

---

A return of 21.9% on sales is quite high in absolute terms, and the increase over the base-year average of 12% is likewise high.

These two indices of excessive profits are strengthened by reference to Shinn's primary renegotiation market—military aircraft parts during the Vietnam war buildup. We have previously recognized the general impact of this war on the military aircraft parts industry. *See Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 502, 211 Ct.Cl. 110, 115 (1976). Shinn's annual report for 1967 reflects the specific impact of the war-fueled demand on its business, referring to a 67% increase in back orders and plants operating at "near capacity" when demand was at a "high level." The company's history (see the last paragraph of Part I, *supra*) indicates that its profit rates were in large part geared to its volume of business during this period. *See generally Manufacturers Service Co. v. United States*, 582 F.2d 561, 573, 217 Ct.Cl. —— (1978).[19]

---

**19.** Plaintiff contends it was not affected by abnormal market dislocations caused by the war, citing the testimony of Mr. Shinn to the effect that none of the planes Shinn Engineer-

Plaintiff offers two explanations to justify its high profits. First, that its gain is justified under the statutory factors, particularly the increased efficiency and capital contribution of its multiple spindle, multiple axis machines. We find this insufficient because a substantial number of Shinn's new machines were already in operation during the latter part of the base years, 1965–1966. We have no indication that the additional use of similar machines alone was sufficient to justify Shinn's considerable jump in profits over the base period. Moreover, as our review of the statutory factors in Part V indicated, we have no certain means of determining how much additional credit Shinn merits. To paraphrase *Bata Shoe*: "We know Shinn was efficient, but how much more efficient was Shinn than any other aircraft part manufacturer?" *Bata Shoe Co. v. United States*, 595 F.2d 9, 23, 219 Ct.Cl. —— (1979).[20] It is too difficult to assume (as plaintiff contends) that Shinn was so efficient as to increase its returns by an average of 53% (profits/capital) or 37.3% (profits/sales) over its own base years.

Shinn's second justification is that its renegotiable profit margins were comparable to its commercial profits during 1967–1968. Using these commercial profits as a base of comparison, plaintiff (along with the trial judge) argues that its renegotiable profits were reasonable. But the use of commercial profits in 1967–68 as the controlling comparison is unacceptable. Plaintiff itself urged before the trial division that commercial sales differed from renegotiable sales in that commercial work involved substantially fewer change orders and less complex machining requirements than its renegotiable business. More importantly, the record contains some evidence suggesting that commercial aircraft demand was also distorted during the war years. Shinn's 1967 Annual Report, in discussing its own substantial backlog, cites industry estimates of a current backlog of $7 billion dollars for commercial aircraft. A comparison of the general aircraft part industry return on sales between 1964–65 and 1967–68 shows a jump from a 5.8% average return to a 9.3% return in 1967 (under $5 million asset companies). We do not reject entirely plaintiff's suggested comparison with commercial sales. Rather, given the countervailing evidence of high profits based on Shinn's own base years and SIC comparative data, we do not believe that plaintiff's 1967-68 commercial profit returns in a period of inflated market demand demonstrate that its renegotiable profits were reasonable.

We remain, then, with the belief that plaintiff made some excess profits in the review years. Because Shinn is entitled to more favorable credit under the statutory factors than the Board allowed, we hold that the excessive profit amounts determined by the Board are too large. This leaves us once again with the oftundertaken, though difficult, task of constructing our own determination of excess profits. Such a determination necessarily requires a "broad brush" approach, *e. g., Bata Shoe Co. v. United States*, 595 F.2d 9, 25, 219 Ct.Cl. —— (1979), which involves "matters of judgment in the highest degree." *Tool Products Co. v. United States*, 589 F.2d 506, 513, 218 Ct.Cl. —— (1978) (Davis, J., concurring).

■ C. *Amount of excessive profits:* We begin with a "starting point" of a 12%

---

ing worked on were used in Vietnam. But Mr. Shinn's statement is contradicted by his company's 1967 annual report, which describes several of the military planes Shinn worked on as "Vietnam veterans" or "backbone vehicles" in the war. Further, the point is not whether a specific part can be traced to Vietnam, but rather whether the general demand was inflated by wartime pressures.

**20.** Plaintiff does attempt partially to quantify the contribution its rebuilt in-house machines made to employed capital, estimating that such machines if purchased new would cost some $1.5 million more than Shinn's actual costs. Plaintiff infers that its rate of return on capital should be recalculated by adding $1.5 million to the denominator—capital employed. However, plaintiff's estimates, as our modified finding indicates, were based solely on its president's own testimony. No records of actual market sales of the same machinery were introduced to support these rough estimates, and we cannot rely on them.

return on sales (31.7% return on capital), which was Shinn's average return during the base years 1964–66. See Parts IV and VI, B, *supra.* To this base we add an award of 6.75% (measured by return on sales) as appropriate credit for all the statutory factors. This award of somewhat more than half of the base return seems adequate in view of the real uncertainty as to the extent of plaintiff's credit for the statutory factors, and the absence of any acceptable quantification in the record. Shinn did not show the special factors present in *Butkin, supra,* or *Aero Spacelines, Inc. v. United States,* 530 F.2d 324, 208 Ct.Cl. 704 (1976), to justify a clearance, nor did it demonstrate entitlement to any higher credit under the statutory factors. *Cf. Tool Products Co. v. United States,* 589 F.2d 506, 218 Ct.Cl. —— (1978). Our reasonable rate of return of 18.75% (12% base plus 6.75% additional credit) may possibly be overly generous, but defendant has failed to substantiate a lower figure. *Cf. Tool Products Co. v. United States,* 589 F.2d 506, 512, 218 Ct.Cl. —— (1978).[21] This results in a finding of $819,000 as reasonable profits for 1967, and approximately $915,000 as reasonable profits in 1968. Excessive profits are the rounded differences between these reasonable profits and Shinn's actual profits of $892,000 in 1967 and $1,146,000 in 1968. Thus, Shinn realized excessive profits of $73,000 in 1967 and $230,000 in 1968.

## CONCLUSION OF LAW

The court concludes as a matter of law that for the 1967 and 1968 fiscal years plaintiff realized $73,000 and $230,000 in excessive profits respectively from con-

tracts and subcontracts subject to the Renegotiation Act of 1951, as amended.

Plaintiff having already paid to defendant the sum computed on the determination of excessive profits by the Renegotiation Board, in lieu of posting a bond to stay the execution of the Renegotiation Board's order, in accordance with the provisions of Section 1218 of Title 50, USC Appendix, plaintiff is held entitled to a refund from defendant of the difference between said sum paid and $303,000, ($73,000 for fiscal year 1967 and $230,000 for fiscal year 1968), less appropriate tax credits plus interest as provided by law, together with interest on said difference from the date of collection by the government to the date of refund. The case is returned to the Trial Division under Rule 131(c) for computation of such amounts.

KUNZIG, Judge, dissenting in part:

I concur in the court's decision as to the accounting issues, Part II, but dissent regarding the court's approach and method of finding excessive profits, Part III—Part VI.

My comments and objections to the court's decision are both specific and general in nature. Specifically, I believe there are technical flaws in the court's determination of excessive profits.[1] There are sounder methods of evaluation which, when applied, demonstrate that plaintiff's profits were not excessive. Indeed, Trial Judge Harkins found plaintiff to be entitled to a clearance. In more general terms, however, I am compelled to express my disagreement with the court's approach of essentially

---

**21.** Our award of an 18.75% return on sales will leave Shinn with the following returns for the two review years:

| 1967 | 1968 |
|---|---|
| return on sales: 18.75% | 18.75% |
| return on capital: 61.5% | 42.4% |
| return on net worth: 86.1% | 68.5% |

In an effort to assess the "normality" of this result, we note the following: Shinn's returns on sales and capital in 1966, a year cleared by the Board (as beneath the minimal amount refundable) though it found some excessive profits, were 17% and 50.8%, respectively. The

range of Shinn's return on capital from 1964–66 was 20–50.8%. The range of return on capital for the aircraft industry in general (in SIC classification 3722) was 10.5–18.3% in 1967–68. Finally, the range of return on capital allowed by the Renegotiation Board was 33%–50%. Thus, measured by these guidelines, our award places Shinn beyond the normal industry range, and at the top of its own prior range. Based on the statutory factors and limited data before us, such an award seems justified.

**1.** See Part III, *infra.*

placing the burden of proof upon plaintiff to show its profits were not excessive in contravention of *Lykes Bros. S. S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972) (hereinafter *Lykes*). The majority's decision is an unwarranted extension of an approach begun in *Major Coat Co. v. United States*, 543 F.2d 97, 211 Ct.Cl. 1 (1976) (hereinafter *Major Coat*) in which the court stated it would "engage in judgmental adjustments and reworkings of the data placed in the record," 543 F.2d at 124, 211 Ct.Cl. at 48, in order to ascertain whether excess profits existed. I agree fully with *Major Coat* and believe its approach plays a necessary role in deciding renegotiation cases. But in the instant case, the majority's independent analysis and reworking of data extends the approach of *Major Coat* to a point where the burden of proof rules delineated by *Lykes* are virtually abolished. In my opinion, *Major Coat* never intended such a result.

The following discussion breaks down into essentially three parts. First there is a review of the development of burden of proof allocation in renegotiation cases concentrating on *Lykes* and Judge Bennett's important opinion in *Major Coat*. The purpose of this review is to demonstrate that there is a key difference between permitting defendant to escape the burden of proof requirements of *Lykes* (in effect, the majority's decision) and engaging in an independent analysis of the record pursuant to *Major Coat* so as to excuse defendant from meeting the stricter evidentiary standards of *Major Coat*.

Second, with this background it can next be seen how, in this particular case, the majority's independent analysis has the effect of repudiating *Lykes* in view of the Government's complete failure of proof and the concededly favorable consideration due to plaintiff under all the statutory factors.

In this second portion, the difference between this case and other cases where excessive profits have been found is also illustrated as well as the practical effect of the "new rule" established by the majority's approach.

Third, even assuming (which I do not) that it is correct to conduct the independent analysis as the majority does, in the last portion of the dissent suggested deficiencies of this independent analysis are discussed. I have put forward an alternative method of analysis indicating plaintiff's profits are not excessive.

I.

### Development of the Burden of Proof Allocation

Until 1971 jurisdiction over contract renegotiation cases was in the United States Tax Court. In line with its practice of placing the burden of proof on taxpayers the Tax Court required the renegotiation petitioner affirmatively to demonstrate that its profits were not excessive. A contractor before the Tax Court had both the burden of proceeding with the evidence, and the ultimate burden of persuasion.[2] *Lykes*, 459 F.2d at 1397, 198 Ct.Cl. at 321.

Congress transferred jurisdiction over renegotiation cases from the Tax Court to the Court of Claims in 1971, and in *Lykes* the court had its first opportunity to reexamine burden of proof responsibilities. Chief Judge Cowen, speaking for the court, stated in his landmark decision that while plaintiffs would still have the "initial burden of going forward with proof" or "the burden of pleading," *Lykes, supra,* 459 F.2d at 1401–02, 198 Ct.Cl. at 326–327, the ultimate burden of proof and risk of nonpersuasion would be upon the Government. After plaintiff had met its initial burden the Government, in rebuttal, must first go for-

---

2. The terms used to describe burdens of proof vary and can be confused. There are essentially two distinct burdens. There is the initial burden of "proceeding with the evidence" also referred to as the "burden of producing evidence," or in renegotiation cases before this court, the burden of "establishing a prima facie case." The second burden is the ultimate "burden of proof" or "burden of persuasion" to convince the trier of fact of the proposition at issue by a preponderance of evidence. The party upon whom the burden of proof is placed is said to bear "the risk of nonpersuasion."

ward with its own evidence to meet plaintiff's prima facie case, and must further satisfy its burden of persuasion by presenting a preponderance of evidence to support its contentions. *Lykes, supra,* 459 F.2d at 1401–03, 198 Ct.Cl. at 327–30. Henceforth, the Government would have to show both that "plaintiff realized excessive profits, as well as the amount of such excessive profits." 459 F.2d at 1403, 198 Ct.Cl. at 330.

The court in *Lykes* recognized it was reversing the Tax Court's assignment of burden of proof. Renegotiation cases, it was noted, differ significantly from tax cases, or any other cases in this court because plaintiff is not seeking to recover a money judgment against the United States; rather, "It is the Government, based upon a unilateral order of the Renegotiation Board, which asserts that the contractor owes it money." 459 F.2d at 1400, 198 Ct.Cl. at 325. Therefore renegotiation cases are analogous to cases before boards of contract appeals where a contractor appeals from a contracting officer's assessment of extra costs and where "the Government has the burden of proof in the de novo hearing before the board." 459 F.2d at 1403, 198 Ct.Cl. at 329.

The *Lykes* allocation of burden of proof responsibilities accords with several fundamental and practical principles. First, our jurisprudence recognizes the general proposition that the party seeking to change the status quo must prove its case, in civil matters, by a preponderance of evidence. In renegotiation cases the Government is accorded a right by statute to challenge the fairness of dealings it freely engaged in and claim it has been the victim of excessive profiteering. It is sometimes difficult to feel great sympathy for the Government's position when the Government often can and has threatened contractors with forced acceptance of Government business unless a contractor "voluntarily" agrees to contract negotiation, *see Major Coat,* 543 F.2d at 103, 211 Ct.Cl. at 11. The Renegotiation Act permits the Government later to complain the profits a contractor made on a contract it was compelled to accept were excessive. Under such circumstances, it seems fair to place the burden of proof on

the Government. Finally, this placement makes sense because the Government is most likely to possess the best information indicating whether plaintiff's profits were excessive. One feature of *Major Coat* was to emphasize the need for comparative data in litigating renegotiation cases. With its ability to draw on Renegotiation Board files and the records of procuring agencies, the Government is best positioned to offer evidence of the profits of companies similar to plaintiff's. The court in both *Lykes* and more recently in *Camel Mfg. Co. v. United States,* 572 F.2d 280, 215 Ct.Cl. 460 (1978) required plaintiff to bear the burden of proof as to the accuracy of the financial figures it submits concerning its own operation because, simply, "plaintiff is in a much better position to prove financial facts concerning its own operations." *Camel,* 572 F.2d at 290, 215 Ct.Cl. at 479. Similarly, defendant is in a much better position to demonstrate plaintiff's excessive profits by use of the comparative data at its disposal. Therefore for this reason as well as others just mentioned it is appropriate that the burden of proof in renegotiation cases be upon defendant.

In *Major Coat* the court refined its burden of proof requirements by calling for defendant to supply data comparing the profits made by plaintiff to the profits of other similar companies. First, the statutory factors of character of business, the net worth and capital employed, and the reasonableness of costs and profits are to be used to identify the firms sufficiently similar to plaintiff to be considered part of plaintiff's industry. The other statutory factors of efficiency, risks assumed, and contribution to defense effort are then used to determine whether plaintiff's profits were excessive relative to similar companies. "Only after all the statutory factors have been considered, the contractor has been 'located' on the industry profit hierarchy, and the profit reasonable for him at the point on the hierarchy is measured against his actual earnings, can it be known whether any part of his profit was excessive." [citation omitted] 543 F.2d at 111, 211 Ct.Cl. at 26.

The court in *Major Coat* realized this approach to standard of proof requirements was more demanding than any previously enunciated. The court concluded application of this exacting standard to cases which had completed trial and were on appeal would be unfair to defendant. Consequently, the court chose to stay application of strict *Major Coat* standards until the Government could catch up with the court's new requirement. Winding up its opinion the court noted:

> In these circumstances, the court will undertake, however reluctantly, and for only a limited span of time, to engage in judgmental adjustments and reworkings of the data placed in the record in order to arrive at a finding of a reasonable profit for the renegotiated contractor—where the state of the evidence permits this to be done in a responsible manner, consistent with the purposes of the Act, as we think is the situation here, . . . 543 F.2d at 124, 211 Ct.Cl. at 48.

Interpretation of this statement goes to the heart of the present case. It seems the statement was intended to provide defendant an "out" from meeting the stricter *Major Coat* standards, but not to relax *Lykes* standards. The authority to "engage in judgmental adjustments and reworkings of the data placed in the record" mentioned in *Major Coat* was meant to lessen the impact of the more exacting standards of *Major Coat*, for a brief time, not to dismiss *Lykes* standards. It is one thing to excuse defendant of the obligation to meet *Major Coat* standards; it is quite another to absolve it entirely from the burden of proof requirements in *Lykes*.

Nor do I believe the cases cited by the majority at the beginning of Part III of the opinion indicate a departure from *Lykes* standards. Granted, the passages cited justify use of a "broad brush" approach or state that exercise of the court's independent judgment can excuse defendant from its *Major Coat* burden of providing "meaningful comparative data," but the passages do not indicate abandon of *Lykes* standards. *See Manufacturers Service Co. v. United States*, 582 F.2d 561, 577 n. 28, 217 Ct.Cl. —— (1978); *Blue Bell, Inc. v. United States*, 556 F.2d 1118, 1124, 213 Ct.Cl. 442, 450 (1977) ("Since defendant has the burden of proof, the absence of this almost indispensible [comparative] data could well lead to a clearance determination"); *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643, 647–48 (1977) (" . . . defendant benefits from the nonapplication to this case of the standards of proof defendant must in future meet as announced in *Major Coat* "); *Tool Products Co. v. United States*, 589 F.2d 506, 508, 218 Ct.Cl. —— (1978) ("Since the trial of this case antedates the warnings we gave in *Major Coat*, defendant benefits from the lenience we promised as to trials that occurred before that date").

By way of summary, *Lykes* announced the burden of proof in renegotiation cases was to be upon defendant. *Major Coat* said that in order to meet this burden defendant must provide comparative data, but absent the presence of comparative data, in cases tried before the new rule of *Major Coat*, the court would independently examine the record to determine whether excessive profits existed. Simply because the court can and will engage in this independent review, however, does not mean *Lykes* standards no longer control. On the contrary, the court in *Major Coat* emphasized *Lykes* was the governing decision as to burden of proof allocation. The discretion to perform an analysis independent of the parties' presentations noted in *Major Coat* was never intended to eviscerate *Lykes*.

## II.

### *Application of Burden of Proof principles to the Present Case*

Trusting I have shown that there is a crucial difference between the court's engaging in an independent analysis of record evidence to excuse defendant from its *Major Coat* responsibilities and the burden of proof defendant must still meet under *Lykes*, let me now move on to illustrate how important this difference is in deciding the case at bar.

Reexamining a bit of history at this point, the position of the parties in Shinn Engineering—before the trial judge—may be roughly described as follows: to demonstrate the existence of excessive profits the Government offered the Mock model, based upon a percentage of return on capital. Trial Judge Harkins rejected the model both because of its use of return on capital as a gauge and for its selection of inappropriate base years. Based upon the level of plaintiff's non-renegotiable or commercial profits, the undisputed favorable consideration due to plaintiff under every statutory factor, and the Government's total failure of proof under *Lykes* standards, the trial judge granted plaintiff a clearance.

During oral argument on appeal, it became painfully obvious the Government had absolutely no evidence to offer of excessive profits other than Dr. Mock's model.

The majority herein also agrees the Mock model is valueless in this case as an excessive profit indicator, as do I. But despite *Lykes*, the Government's complete failure of proof apparently does not indicate to the majority that plaintiff deserves a clearance. The majority cites the cases at the beginning of Part III of its decision and discussed above for the proposition that "the court's consideration of excessive profits can be more lenient toward the defendant than it might be under a strict application of the burden of proof set forth in *Lykes*." With this authority, the majority proceeds to find the existence of excessive profits on a theory advanced by neither the parties nor by the trial judge. I have particular doubts about the court's technical analysis and use, for example, of SIC data.[3] But the crux of the matter is simply this: though the Government has failed completely to meet its burden of proof or even establish a prima facie case, and though plaintiff unquestionably merits favorable consideration under every statutory factor, and its commercial profit figures indicate its renegotiable profits were not excessive, the majority still contends *Major Coat* and cases since permit it independently to find excessive profits in

circumvention of the *Lykes* burden of proof allocation.

I do not believe the authority of *Lykes* has been so completely eroded, though the results of some recent renegotiation cases and most spectacularly this case, suggest it has. Let me hypothesize as to what has apparently happened: defendant's evidentiary presentations continue to be anemic as suggested in *Major Coat*. This forces the court, more often than perhaps it should, to engage in independent evaluation and analysis of the data presented to find the existence of excessive profits and resuscitate defendant's dying case. As authority to do this, the court has perhaps overextended the discretion it said it would exercise in *Major Coat*. I cannot say use of this discretion in previous cases was inappropriate. At least in prior cases the Government has managed to offer some credible evidence. Here, however, defendant relied 100% on the Mock model as its total evidence. That model has now been rejected by the trial judge, by the majority, and by this dissent. In this case the evidence offered by the defendant is not merely "weak" or "scanty material"; it is nothing. Moreover, it is conceded plaintiff deserves favorable or very favorable consideration under every statutory factor. Plaintiff's ingenious development of multi-spindle, multi-axis machinery not only made plaintiff extraordinarily efficient, but uniquely efficient, for no other contractor possessed this machining capability. The Government has offered no evidence detracting from plaintiff's outstanding performance according to the statutory factors. It seems the government would have done just as well had it submitted a one sentence brief: "The defendant believes plaintiff's profits were excessive."

Under the majority's "new rule," we have in effect a further development in standard of proof requirements, a phenomenon which plaintiff's counsel in oral argument wryly called the "ping-pong" effect. First plaintiff must put on its prima facie case, which

**3.** See Part III, *infra*.

all agree is not difficult to do. Then defendant must establish its own prima facie case and meet its burden of proof of excessive profits by a preponderance of evidence. Yet, should defendant fail this task the burden again bounces back to plaintiff to convince the court its profits actually were not excessive, that *all* the additional profits it made above a normalized figure can be attributed to the various statutory factors. The burden is insuperable.

Now, some may argue *Lykes* should be modified or reversed. Perhaps this court should abandon burden of proof analysis entirely and invite the parties to submit the best evidence they can and make a reasoned judgment accordingly. If so, let it be after thorough discussion of the approach the court will adopt. Otherwise we shall promote confusion among parties and the court's trial division as to how renegotiation cases are to be handled and risk inconsistency in our own decisions.

### III.

### *Deficiencies in the Majority's Analysis*

The foregoing discussion questions the propriety of the court's action in this particular case under *Lykes* standards. Yet even assuming it is proper to engage in the independent analysis the court does, the structure of the analysis has several weaknesses. Sounder methods of evaluation, I believe, demonstrate plaintiff's profits were not excessive.

The majority bases its excessive profit determination on two factors: the Internal Revenue Service's Standard Industrial Classification (SIC) composite statistics and a starting point of 12% return on renegotiable sales (profit to sales ratio), 12% being the average return during the three-year base period of 1964–66 selected by the court. Reference to SIC data as an indicator of excessive profits is particularly surprising since as the trial judge recognized, even defendant's expert made no serious attempt to justify the data's usefulness given its deficiencies. In previous cases this court has not merely "questioned the strength of such industry wide statistics," but has excoriated their use, *see Instrument Systems Corp. v. United States*, 546 F.2d 357, 361, 212 Ct.Cl. 99, 106–08 (1976). In *Butkin Precision Manufacturing Corp. v. United States*, 544 F.2d 499, 504, 211 Ct.Cl. 110, 118–19 (1976) (hereinafter *Butkin*) the court said comparisons based on SIC aircraft parts industry data (on which the majority herein relies) were "superficial at best." Though the *Butkin* court mentioned that "merely because comparative data has some weaknesses is no reason to ignore it entirely" the court immediately added, "However, it [SIC data] is little more than useless in this case because the court has been provided with no standard by which to judge the results of the comparison." 544 F.2d at 504, 211 Ct.Cl. at 119. Plaintiff in *Butkin* received a clearance. The shift of Shinn from the $5 million asset class to the $10 million asset class renders the SIC comparison even more unreliable than usual. It is commendable for the majority to note some of these drawbacks, but simply recognizing the flaws does nothing to restore the data's usefulness. True, the SIC data was part of the record, but that in itself cannot justify its applicability to this case. The SIC data as Trial Judge Harkins found, really deserves no reference except to dismiss its relevance.

Thus, the majority is left with its computation of a 12% average return on sales for a base period 1964–66. It is not clear why the years 1964–66 are deemed appropriate for comparison purposes other than the reason that Dr. Mock was remiss in not including 1966 with 1964 and 1965 in his base year comparison. The record contains evidence showing it is inappropriate to include 1964 and 1965 as base years for comparative purposes, leaving plaintiff's profit figures of 1966 as the only reliable evidence of what a reasonable "starting point" would be. During 1963 through 1965, Shinn was engaged in an extensive capital improvement program to such a degree that in 1964 and 1965, Shinn's accounts receivables were being factored and all of its assets, including its capital equipment and inventory were pledged for operating capital; 1966

was the first year Shinn's operation was bankable. Furthermore, starting in 1965, substantial changes occurred in Shinn's production equipment and in the complexity of parts for the aerospace and aircraft industries. The production of more complex parts gave Shinn an added advantage over its competitors as use of the multiple spindle, multiple axis equipment by Shinn resulted in reduced labor costs and increased Shinn's quality and quantity of output. Moreover, materials utilized in the aerospace industry changed. Before 1965 aluminum was the primary material used to fabricate structural parts manufactured by Shinn. After 1965, stainless steel and titanium, which are more difficult to machine and require longer production times came into use.[4] Because Shinn's financial structure was abnormally unstable in 1964 and 1965 and because the character of the aerospace parts industry underwent a substantial change beginning in 1965, I believe it is incorrect to include 1964 and 1965 as base years for comparison purposes. Though it is unfortunate only one year, 1966, can be reliably used as an indication of what Shinn's "normal profits" were, record evidence supports this conclusion.

In 1966, Shinn's return on renegotiation sales was 17.01%. Even accepting the credit for all statutory factors determined by the majority of 6.75%, the result, 23.76% return on sales, is more than enough to warrant a clearance for plaintiff with a 20.43% return on renegotiable sales of 1967 and a 23.47% return on sales for 1968.

Comparing the return on sales for plaintiff's *non* renegotiable business fortifies the clearance result since in 1967 the return on nonrenegotiable sales was 25.50% and in 1968, 22.29%. The majority rejects a comparison to nonrenegotiable profits using, once again, the inherently unreliable SIC data. As an additional reason for rejecting the nonrenegotiable comparison, the majority implies the relevant market was distorted by high demand. Statements in Shinn's annual reports indicating order backlogs and a favorable business climate are cited as evidence of market distortion. I question whether statements which may be little more than normal annual report puffery are sufficient evidence upon which to conclude the relevant market was distorted. On the contrary, the trial judge explicitly stated that "There is no indication in the record that the markets in which Shinn was operating were subject to conditions that resulted in a breakdown of competitive forces." Finally, defendant has argued that plaintiff's nonrenegotiable figures are unreliable yet the figures and the accounting practices used in their computation were approved after an FBI audit. Furthermore, defendant stipulated to the accuracy of the figures.

In short, defendant has not presented a convincing reason to reject a comparison with plaintiff's nonrenegotiable figures. Plaintiff's nonrenegotiable return on sales for the years in review plus a comparison to 1966 as a base year show plaintiff is entitled to a clearance. Nor is this result extraordinary considering the clearances given in *Butkin* and also in *Aero Spacelines v. United States*, 530 F.2d 324, 208 Ct.Cl. 704 (1976).

One final point deserves attention. Implicit in the majority's approach is the notion that plaintiff cannot receive a clearance unless it can affirmatively demonstrate that all the profits it made above a normalized figure are attributable to one or more of the various statutory factors. I cannot accept such a position for several reasons. In the first place, to the degree the court implies that plaintiff must prove the *absence* of excessive profits, the court repudiates the *Lykes* burden of proof allocation. Moreover, we have stated in previous opinions that it is not *plaintiff's* obligation to show that its increased efficiency, for example, accounts entirely for its higher profits. Instead, "it would seem the burden of proof would require *defendant* to put a cap on the claim, i. e., supply something to enable the court to determine its limits." *Butkin*, 544 F.2d at 510, 211 Ct.Cl. at 130

---

4. See statement of facts, majority opinion.

(emphasis added). *See also Major Coat*, 543 F.2d at 117, 211 Ct.Cl. at 36; *Dynasciences Corp. v. United States*, 214 Ct.Cl. at 669 (1977).

Even if we should assume that plaintiff does have the burden of showing the statutory factors make up for its higher profits, I believe plaintiff has, in this exceptional case, met the burden. The Government concedes plaintiff deserves favorable or very favorable consideration for each statutory factor. Not only this, but it appears plaintiff was highly efficient in comparison to other similar companies because only plaintiff possessed the extraordinary multi-spindle, multi-axis machinery which made plaintiff such a superior contractor. In *Major Coat*, 543 F.2d at 117, 211 Ct.Cl. at 36, the court recognized that while plaintiff had been shown to be efficient, there was no way to gauge its efficiency relative to other firms. I think in this case it is a fair inference that plaintiff was significantly more efficient than other similar firms for only plaintiff, having created the equipment itself out of scrap materials, had this exceptional machinery.

Accordingly, for the above reasons, I believe plaintiff is entitled to a clearance. Therefore, with respect, I dissent.

